# FOR PUBLICATION



**FILED**

Nov 19 2014, 9:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**KARA E. KROTHE**
**NOAH T. WILLIAMS**
Monroe County Public Defenders
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PHILLIP D. MUNDY<br>and MERLE JOST, | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 53A01-1403-CR-122 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MONROE SUPERIOR COURT III
The Honorable Kenneth G. Todd, Judge
Cause Nos. 53C03-1208-FC-801, 53C03-1208-FC-803

**November 19, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Phillip D. Mundy ("Mundy") and Merle Jost ("Jost") (collectively, "the Defendants") were charged with Class D felony conspiracy to commit dealing in marijuana; Mundy was also charged with Class D felony maintaining a common nuisance. The Defendants filed motions to suppress certain evidence, which the trial court denied. The Defendants appeal from the trial court's interlocutory order and present two issues, which we consolidate and restate as whether the police violated the Defendants' constitutional rights to be free from unreasonable searches and seizures. Concluding that the actions of the police in this case were unreasonable under the circumstances, and therefore violative of Article 1, Section 11 of the Indiana Constitution, we reverse and remand.

### Facts and Procedural History

On August 24, 2012, Detectives Brandon Lapossa ("Detective Lapossa") and Rick Crussen ("Detective Crussen") of the Bloomington Police Department were looking for Clinton Douthitt ("Douthitt").[1] Douthitt worked for a moving company, and the police had information that Douthitt may have been involved in the theft of a handgun that had been taken from one of the company's clients. They also thought that this handgun may have been used in a murder.[2] The detectives looked up Douthitt's information with the Indiana Bureau of Motor Vehicles ("BMV") and found that his last address was listed as 6552 East Collins Lane in Bloomington, Indiana. The detectives went to Collins Lane looking for Douthitt's address. They initially went to the front door of a house they

---

[1] Douthitt's name is mistranscribed in the transcript as "Dolphet."

thought was 6552 East Collins Lane and knocked on the door, but no one answered. They then looked at mailboxes located on the side of the road and decided to try another home located at the end of a long driveway.

The detectives drove up the private drive for about fifty yards until they saw a cable stretched across the drive. The cable was fastened to two posts at opposite sides of the drive and secured by two padlocks, at least one of which was unlocked. There was also an "ADT" security sign posted near the cable and a small, black security camera on a nearby tree. Also nearby, but not noticed by the detectives, was a "No Trespassing" sign located on a tree just beyond the cable to the right of the driveway. Despite all of these clear warnings that visitors to the premises were not invited or desired, Detective Crussen exited the police vehicle, removed the cable from one of the padlocks, and lowered the cable so that he and Detective Lapossa could proceed to drive up the driveway. As they drove up the driveway, the detectives saw a mobile home ahead, with several outbuildings, including a garage, to the left of the driveway as they proceeded toward the home.

The detectives parked their car approximately seventy to one-hundred yards away from the mobile home, exited the vehicle, and began to walk toward the home. As they did so, they detected an odor of marijuana that seemed to be coming from the area of the garage. Shortly after the detectives exited their vehicle, defendant Jost came out of the garage, at which time the odor of marijuana became stronger. Detective Crussen asked Jost if Douthitt was nearby, to which Jost responded negatively. Thereafter, Janice Stam

---

[2] The police later determined that the gun stolen was a 9 mm pistol, whereas the weapon used in the murder was a .45 caliber pistol.

3

("Stam"), came out of the mobile home and informed the police that she was the owner of the property. She also told the police that she had lived there for over twenty years and had never heard of Douthitt. The detectives asked Stam about the odor of marijuana and asked her if she wanted them to check to see if someone was smoking marijuana on her property. Stam said no, and refused the detectives' request for consent to search the property.

Although the detectives had not seen any weapons, they then secured Jost and Stam for purposes of officer safety. Detective Crussen then entered the mobile home, without a warrant, and brought out the two other occupants, defendant Mundy and his girlfriend. When Detective Crussen asked again about Douthitt, Mundy informed him that the detectives were at the wrong address. Douthitt's address was 6552 East Collins Lane, but Stam's property was located at 6225 East Collins Lane.

Based on the odor of marijuana they had smelled, and the presence of plants near the mobile home that they believed to be marijuana, the detectives applied for and received a search warrant for the premises. During the execution of this warrant, the police discovered over 100 marijuana plants. As a result, the State charged Mundy on August 30, 2012 with Class C felony conspiracy to commit dealing in marijuana and Class D felony maintaining a common nuisance. The State charged Jost with Class C felony conspiracy to commit dealing in marijuana. The State later amended the charges to allege that the Defendants committed Class D felony conspiracy to commit dealing in marijuana.

The Defendants filed motions to suppress the evidence seized during the execution of the warrant on February 6, 2013. The trial court held a hearing on these motions on June 4, 2013, and following briefing by the parties, denied the motion to suppress on July 29, 2013. The Defendants then filed a motion to reopen the evidence,[3] which the trial court granted. The court held another evidentiary hearing on the motion to suppress on November 14, 2013, and reaffirmed its denial of the motion to suppress on January 9, 2014. On February 6, 2014, the Defendants moved the trial court to certify its order for interlocutory appeal, which the trial court did on February 14, 2014. The Defendants filed a motion with this court on March 14, 2014, requesting that we accept interlocutory jurisdiction. We granted this motion on April 21, 2014, and this appeal ensued.

## I. Standard of Review

The standard of review from a trial court's denial of a motion to suppress evidence is similar to other sufficiency issues. Litchfield v. State, 824 N.E.2d 356, 358 (Ind. 2005). We determine whether there was substantial evidence of probative value to support the trial court's ruling. Id. In so doing, we do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. Id. Unlike other sufficiency matters, however, we may also consider uncontested evidence that is favorable to the defendant. Westmoreland v. State, 965 N.E.2d 163, 165 (Ind. Ct. App. 2012).

---

[3] On September 9, 2013, the Defendants also filed a motion requesting the trial court to certify its order denying the motion to suppress for interlocutory appeal. It does not appear that the trial court ruled on this motion. Accordingly, the motion was deemed denied thirty days after it was filed. See Appellate Rule 14(B)(1)(e).

## II. Article 1, Section 11 of the Indiana Constitution

The Defendants claim that the police action here violated their rights under both the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Because we conclude that the police action here was unreasonable under Article 1, Section 11, we do not address the Defendants' claims under the Fourth Amendment.

Article 1, Section 11 of the Indiana Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Although the language of Article 1, Section 11 tracks the Fourth Amendment verbatim, Indiana courts have explicitly rejected the "expectation of privacy" as a test of the reasonableness of a search or seizure. Litchfield, 824 N.E.2d at 359. Instead, the legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. Id. (citing Moran v. State, 644 N.E.2d 536, 539 (Ind. 1994)).

When considering the totality of the circumstances, we must consider both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure. Myers v. State, 839 N.E.2d 1146, 1153 (Ind. 2005) (citing Litchfield, 824 N.E.2d at 360). Although there may well be other relevant considerations under the circumstances, the reasonableness of a search or seizure turns on a balance of: (a) the degree of concern, suspicion, or knowledge that a

6

violation has occurred, (b) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and (c) the extent of law enforcement needs. Id. (citing Litchfield, 824 N.E.2d at 361). The degree of intrusion is evaluated from the defendant's point of view. Duran v. State, 930 N.E.2d 10, 18 (Ind. 2010) (citing Litchfield, 824 N.E.2d at 360).

In determining whether the police behavior was reasonable under Section 11, we consider each case on its own facts and construe the constitutional provision liberally so as to guarantee the rights of people against unreasonable searches and seizures. Brown v. State, 653 N.E.2d 77, 79 (Ind. 1995). It is the State's burden to prove that the search was reasonable under the totality of the circumstances. Mitchell v. State, 745 N.E.2d 775, 786 (Ind. 2001).

A. *Degree of Concern, Suspicion, or Knowledge*

Here, the degree of concern, suspicion, or knowledge that the police had was not terribly strong. Although the crimes they were investigating were serious, the State provided scant evidence regarding how the detectives came to suspect Douthitt. Detective Crussen explained that Douthitt had possibly been part of the moving crew that worked a job where a handgun later went missing. See Tr. pp. 2-4. Thus, it appears that the police were simply attempting to find Douthitt for a "stop and talk" consensual encounter. There is no evidence that the police had probable cause, or even reasonable suspicion, to detain Douthitt in connection with the theft of the gun or the murder. More importantly, the police were unsure as to where Douthitt lived. They knew that he had lived on East Collins Lane at some point, and had an address where they thought they

7

might locate him. But they were unsure as to exactly where he lived, and took little or no steps to make sure that they had the right address when they encountered the cable stretched across the drive.

B. *Degree of Intrusion*

Here, it is the degree of intrusion that is most troubling about the actions of the police at issue in this appeal. When the police drove several yards up the drive they encountered what can only be described as a sign that strangers were not welcome. A cable blocked the drive—a clear indication that the occupants of the land did not desire unknown vehicles to drive further onto the property. There was also a home-security sign posted near the cable and a security camera on a nearby tree. Again, these are not exactly indications that visitors are welcome. And even though it was not noticed by the detectives, we cannot overlook the fact that there was also a "No Trespassing" sign posted on a tree just beyond the cable.

Under these circumstances, a reasonable person would not feel welcome to take down the cable without permission and continue to drive onto the property. Indeed, a person who, not having a contractual interest in the property, knowingly enters the real property of another person after having been denied entry by the other person commits criminal trespass. See Ind. Code § 35-43-2-2(b)(1). And a person may be "denied entry" by oral or written communication, court order, or by "posting or exhibiting a notice at the main entrance in a manner that is . . . likely to come to the attention of the public." I.C. § 35-43-2-2(c). Based upon the evidence presented at the suppression hearing, it appears that the cable, the camera, and the signs posted here were likely to come to the attention

8

of the public. But even if the intrusion of the detectives was not committed knowingly for purposes of the criminal trespass statute, we cannot say that the nature of their intrusion supports a determination that their conduct was reasonable.[4]

In this sense, we find this case is distinguishable from Baxter v. State, 891 N.E.2d 110 (Ind. Ct. App. 2008), which the trial court relied upon. In that case, the court rejected the defendant's claim that a "no trespassing" sign rendered the actions of the police unreasonable under Article 1, Section 11. Id. at 119. However, in Baxter, there appears to have been no evidence of the sign other than the defendant's testimony. See id. (referring to defendant's "claim" that there was a no trespassing sign and noting that the police denied seeing such a sign). Here, even though the officers denied seeing the no trespassing sign, there was photographic evidence that the sign was located near the cable.

More importantly, however, in Baxter, the police stayed on a path "that any regular visitor would take." Id. And the court held that police should not be thwarted from ever approaching a home along paths that regular visitors would take simply by the posting of a no trespassing sign. Id. Here, however, the police did not simply walk to the front door of a residence along paths that normal visitors would take. To the contrary, the presence of the cable, the signage, and the security camera would make a reasonable person feel distinctly unwelcome. Indeed, Mundy testified that unexpected visitors were

---

[4] Although Detective Crussen testified that he saw no indications that a mailman or deliveryman would be excluded, he and Detective Lapossa also testified that they thought they were at the correct address based upon the mailbox located on East Collins Lane. In other words, the mailboxes were located on the road, not up on the property, making it unlikely that the postal (or other) deliveries would be made at the house. Indeed, there was uncontradicted testimony from Mundy that any deliveries for their residence were left with the neighbor across the road.

not welcome to, and had not taken down the cable and that even expected guests called ahead to make sure that the "gate" was unlocked.  Tr. p. 98.

### C.  *The Extent of Law Enforcement Needs*

Lastly, we consider the extent of law enforcement needs.  To be sure, Douthitt's boss had told them that Douthitt had indicated that he planned to move to Florida quickly and would not be returning to work.  But as noted by the Defendants, the police were simply looking to talk to an individual who they thought might have been involved with the theft of a handgun and who might be at that address.  Although the detectives were undoubtedly investigating serious crimes, there is no indication that there were any circumstances, such as a hot pursuit, that would justify their intrusion.[5]  Cf. Holder v. State, 847 N.E.2d 930, 940-41 (Ind. 2006) (holding that warrantless entry into home was justified by exigent circumstances where large amounts of ether fumes were emanating from the home and the occupants of the home included a child); Carpenter v. State, 974 N.E.2d 569, 575 (Ind. Ct. App. 2012) (holding that extent of law enforcement needs was only "moderate" even where the officers had a warrant to arrest someone they believed to be at the home).

### D.  *The Totality of the Circumstances*

Under the totality of the circumstances presented here, we cannot say that the State met its burden of establishing that the actions of the detectives in this case were

---

[5]  Nor does the behavior of the detectives after their intrusion onto Stam's property bolster the State's argument that their behavior was reasonable.  Based upon the smell of marijuana and what appeared to be marijuana plants growing outside the home, Detective Crussen entered Stam's home without a warrant and ordered the occupants to leave.  Although he testified that he did so based on concerns of "officer safety," this is not a talismanic phrase that permits an officer to enter a home absent a warrant or exigent circumstances.  And the State presented nothing which would support a finding of exigent circumstances.

reasonable. Accordingly, we hold that the detectives' conduct violated Article 1, Section 11 of the Indiana Constitution. The the subsequent search warrant was based on information known to the detectives only as a result of their violation of Article 1, Section 11.

This case is readily distinguishable from Trimble v. State, 842 N.E.2d 798 (Ind. 2006), also cited by the trial court. In that case, the police received a tip that a dog was emaciated and in need of medical attention. An officer went to the home of the dog's owner to investigate the tip. The officer drove to the back of the house on a driveway regularly used by visitors, got out of his car, and walked past the doghouse, which was about thirty feet from the house and three or four feet from the driveway. When no one answered the door at the house, the officer went back to the doghouse, pulled the dog out of it by his chain, and saw that he was emaciated and had an injured leg. The State charged the animal's owner with neglect, and the owner moved to suppress the evidence related to the officer's observations of and seizure of the dog. The trial court denied the motion to suppress. On appeal, our supreme court held that the search and seizure was permissible. Id. at 800.

With regard to Article 1, Section 11, the Trimble court applied the three-part test from Litchfield and concluded that the officer's actions were reasonable. Id. at 803-04. The court first concluded that the degree of police intrusion was minimal because the officer entered onto the property through generally-accessible routes to investigate an "apparently credible lead." Id. at 803. This contrasts starkly to the present case where the police disregarded the "gate" and the signs indicating that visitors were not welcome.

11

Although the <u>Trimble</u> court held that "[p]olice are authorized to conduct routine preliminary investigations, including calling on private citizens through normal means of approach to residences or other structures," in the case before us, the police did not simply knock on a door or enter onto a porch. They ignored the signs that visitors were not welcome and removed the cable from across the driveway.

In <u>Trimble</u>, the court held that the police had a reasonable suspicion to investigate the premises based upon a tip. This tip was based on the tipsters' personal observations, the officer corroborated much of the tip, and the tipsters identified themselves to the police. Thus, the officer's suspicion that an animal was being neglected was reasonable. Here, however, the police had no suspicion that any crime was occurring on the property. Instead, they were simply looking for an individual who may have been a suspect in a theft.

Lastly, the <u>Trimble</u> court addressed the extent of law enforcement needs and stated that "the severity of the law enforcement need embraces proper concern for the health and safety of others, including animals. Where a police officer has received a timely tip concerning a possibly dangerous situation, the privacy interest is diminished." <u>Id</u>. at 804. Here, however, the police were not responding to a concern for the health or safety of anyone or any animal. They were instead trying to speak with an individual who was a suspect in a theft. In short, we think that <u>Trimble</u> is distinguishable and that the actions of the police detectives in the present case was unreasonable.

We therefore conclude that the actions of the detectives in the present case were unreasonable and that the warrant to search Stam's property was thus based on

12

information gathered unconstitutionally and should not have been issued. See Sanchez v. State, 803 N.E.2d 215, 221 (Ind. Ct. App. 2004) (noting that "fruit of the poisonous tree" doctrine bars evidence directly obtained and evidence derivatively gained as a result of information learned or leads obtained during an unlawful search of seizure); Gyamfi v. State, 15 N.E.3d 1131, 1138 (Ind. Ct. App. 2014) (applying fruit of the poisonous tree doctrine to Article 1, Section 11 claim).[6]

**Conclusion**

Under the facts and circumstances of the present case, we conclude that the conduct of the police detectives was not reasonable. The detectives' intrusion onto the property at issue therefore ran afoul of Article 1, Section 11 of the Indiana Constitution. The search warrant that was subsequently issued based upon what the detectives observed on the property was therefore also improper. For all of these reasons, we reverse the trial court's order denying the Defendants' motions to suppress, and remand for proceedings consistent with this opinion.

Reversed and remanded.

RILEY, J., and CRONE, J., concur.

---

[6] The State makes no argument that the "good faith" exception should apply in this case, and we therefore decline to address this issue.