Mathias, Judge.
[1] For purposes of privacy interests protected by Article 1, Section 11 of the Indiana Constitution, closed doors matter; high fences matter; roped-off drives matter; closed drapes matter; and in this case, a closed and locked gate matters.
[2] Here, Conn appeals the trial court's decision to admit evidence obtained during a search at a private conservation club, arguing that the warrantless entry and search of the club violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.[1]
[3] Because we conclude that the officers' actions in this case were unreasonable under the circumstances, and therefore impermissible under Article 1, Section 11, we reverse and remand.[2]
*1096 Facts and Procedural History
[4] Late in the evening on April 1, 2015, Frederico Conn attended a party with friends at the Laurel Conservation Club ("the Club") during which Conn and other attendees shot firearms at a pizza box that had been converted into a target. Around midnight, Cheryl Benevengo ("Benevengo"), who lives next to the Club, heard gunshots as she drove by on her way home from work. She also noticed people outside the Club having a party. The Club has an active shooting range, and Benevengo often heard gunfire coming from that direction. However, she had never before heard gunfire so late on a weeknight. After an hour of continued noise and activity coming from the Club, Benevengo called the police. She told the dispatch officer that firearms were being shot, and that it was possible animals were being killed illegally.[3]
[5] Roughly forty-five minutes later, three officers arrived at the Club in separate marked cars: Department of Natural Resources Officer Andy Hagerty ("Officer Hagerty"), and Franklin County Sheriff's Department Deputies Adam Henson ("Deputy Henson") and Jeffrey Staat ("Deputy Staat"). By the time the officers arrived, the gunfire had ceased and the activity was winding down.
[6] A locked gate obstructed the main road from the lane leading back to the Club.[4] As the officers pulled up, a vehicle was attempting to leave the Club property, but was blocked in by the gate. The driver of the vehicle, Josh Wright ("Wright"), told the officers that he was waiting for someone to come unlock it. All three officers climbed over or otherwise maneuvered around the gate. Deputy Staat stayed with Wright, while Officer Hagerty and Deputy Henson began walking down the Club's lane where they saw a group of four individuals standing beside two vehicles next to the Club's building.
[7] As the officers made their way down the lane, they observed Conn veer away from one of the two vehicles and walk behind the Club's building. The officers found this behavior suspicious and decided to investigate what Conn was doing. Officer Hagerty then saw Conn jogging towards him from behind the building, and he asked Conn what he was doing back there. Conn told the officers that he had been urinating. After further questioning, Conn admitted that he had hidden a firearm behind the building.
[8] Conn led the officers back to where he hid the firearm under a board and some leaves. In addition to a .22 caliber handgun, the officers also discovered two change purses and a box of .22 caliber ammunition nearby. Inside the change purses the officers found a glass pipe, a pen modified into a straw, and baggies containing methamphetamine.
*1097 [9] Conn was charged with Level 6 felony possession of methamphetamine, Class A misdemeanor possession of a firearm by a domestic batterer, and Class A misdemeanor possession of paraphernalia. A two-day jury trial commenced on January 18, 2017, and during trial Conn objected to the admission of the evidence retrieved from the Club. The trial court overruled the objection, and the jury found Conn guilty. On February 14, 2017, Conn was sentenced to two-and-one-half years to be served at the Franklin County Security Center. Conn now appeals.
I. Standard of Review
[10] When reviewing a trial court's ruling on the admissibility of evidence resulting from an allegedly illegal search, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. Cartwright v. State , 26 N.E.3d 663, 667 (Ind. Ct. App. 2015), trans. denied. However, the constitutionality of a search or seizure is a pure question of law that we review de novo. Browder v. State , 77 N.E.3d 1209, 1213 (Ind. Ct. App. 2017), trans. denied.
II. Article 1, Section 11 of the Indiana Constitution
[11] Conn claims that the officers' actions here violated his rights under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Because we conclude that the officers' actions here were unreasonable under Article 1, Section 11, we do not address Conn's claims under the Fourth Amendment.
[12] Under Article 1, Section 11, the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). Our supreme court has explained that the reasonableness of a search or seizure necessitates a balancing of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. Id. at 361. In evaluating these factors to determine whether police behavior in a given case was reasonable under Section 11, we consider each case on its own facts, and we construe the constitutional provision liberally so as to guarantee the rights of Hoosiers against unreasonable searches and seizures. Mundy v. State , 21 N.E.3d 114, 118 (Ind. Ct. App. 2014). Thus, it is the State's burden to prove that the police intrusion was reasonable under the totality of the circumstances. Austin v. State , 997 N.E.2d 1027, 1034 (Ind. 2013).
A. Degree of Concern, Suspicion, or Knowledge
[13] Here, the degree of concern, suspicion, or knowledge the officers had that a violation of law had occurred was negligible. The officers arrived at the Club to investigate "ongoing shooting" and that "maybe [those at the Club] were shooting some animals." Tr. p. 72. However, once the officers arrived, the shooting had stopped. There was no evidence of poaching or any animals being killed. And Ms. Benevengo testified that it "looked like they were [ ] wrapping it up by the time [the officers] got there." Id. at 27.
[14] The State argues that the degree of concern was high because the officers received a tip that led them to believe criminal activity was occurring at the club. However, there is no evidence supporting this conclusion. During trial, each of the three officers conceded that it is not against the law to shoot a gun at a conservation club, and none of the officers saw any evidence of poaching. Further, there were no allegations of other criminal activity *1098 that Conn and those at the Club may have been involved in. Simply put, at the time the officers arrived at the Club, there was little, if any, evidence that Conn had violated any laws. See Trotter v. State , 933 N.E.2d 572, 580 (Ind. Ct. App. 2010) (finding that the officers' degree of concern, suspicion, or knowledge that a violation had occurred was "non-existent" where the officers arrived on scene to investigate a complaint of gunshots fired in a backyard). Under the facts and circumstances before us in this case, the degree of the officers' suspicion here was minimal.
B. Degree of Intrusion
[15] The degree of intrusion is evaluated from Conn's point of view. See Litchfield , 824 N.E.2d at 360. This factor is the most concerning aspect about the officers' conduct in this appeal. When the three officers arrived at the Club property, they were barred from entering the Club by a locked gate. Each officer then either jumped over or maneuvered around the gate. Moreover, during this time, Wright was in his vehicle attempting to exit the Club and waiting for someone to come unlock the gate so he could leave. Under these circumstances, the officers could have either: (1) waited for the gate to be unlocked and stopped persons on their way out; or (2) obtained a warrant. There was no reason to ignore a locked gate.
[16] The State contends that the degree of intrusion was low; however, its assessment fails to acknowledge that the officers encountered a locked gate. Our courts have consistently held that when Indiana citizens put mechanisms in place to keep others out, ignoring these obstructions constitutes highly intrusive conduct by law enforcement. See Carpenter v. State , 18 N.E.3d 998, 1002 (Ind. 2014) (explaining that the degree of intrusion was high where officers jumped over a locked gate and fence to reach an open door); Mundy , 21 N.E.3d at 119 (finding the degree of intrusion was high when officers took down a cable that was blocking a drive); Trotter , 933 N.E.2d at 581 (concluding that the degree of intrusion was immense where the officers entered a pole barn through an unlocked door); Divello v. State , 782 N.E.2d 433, 438 (Ind. Ct. App. 2003) (holding that walking through a privacy gate is highly intrusive because the area cannot be regarded as one where uninvited visitors would normally be expected to travel). Under the facts and circumstances before us, the degree of intrusion on the ordinary activities of the partygoers and Conn was substantial.
C. The Extent of Law Enforcement Needs
[17] Finally, we consider the extent of law enforcement needs. There was absolutely no evidence of emergency or outside threat to the public, and the officers had several other ways that they could have addressed Ms. Benevengo's concerns. See Masterson v. State , 843 N.E.2d 1001, 1007 (Ind. Ct. App. 2006) (explaining that the third Litchfield factor "requires consideration of the nature and immediacy of the governmental concern."), trans. denied . The officers could have asked Wright about the noise and activities at the Club when they encountered him at the gate. Or, the officers could have waited for someone to come let Wright out and then asked for permission to enter the property.
[18] Although the officers were responding to reported gunfire late on a weeknight, we find it significant that the gunfire was ongoing at a Club with a shooting range, where gunfire is not uncommon. And Conn was firing at a pizza box converted into a target-this is not a situation where an individual is waving a gun around in public in a densely populated area. See *1099 Grayson v. State , 52 N.E.3d 24 (Ind. Ct. App. 2016), trans. denied. Additionally, there was no evidence of exigent circumstances that would have justified the officers' unlawful intrusion. Cf. Holder v. State , 847 N.E.2d 930, 940-41 (Ind. 2006) (holding that warrantless entry into a home was justified where large amounts of ether fumes were emanating from the home and pervading the neighborhood); VanWinkle v. State , 764 N.E.2d 258, 266-67 (Ind. Ct. App. 2002) (holding that a warrantless entry into a residence was appropriate where officers had reasonable grounds to believe immediate aid was needed inside), trans. denied .
[19] The State argues that the extent of law enforcement needs was high because of reports of "armed individuals shooting randomly at areas and at times not common for the area." Appellee's Br. at 23. But the shooting had stopped by the time all three officers arrived at the Club. And there is no evidence that any of the partygoers on the Club property that evening were, or had been, "shooting randomly." Instead, the evidence presented at trial indicates that Conn and those he was with were firing at a pizza box. The officers did not need to jump over a locked gate in order to investigate what amounted to a noise complaint. See Carpenter , 18 N.E.3d at 1003 (finding that law enforcement needs were low where there was no evidence of anyone in danger of harm or in need of assistance and where the police had other means of addressing the situation).
D. Balancing the Totality of the Circumstances
[20] Taken together, these factors lead us to conclude that the State has not met its burden of establishing that the officers' actions in this case were reasonable. The degree of concern, suspicion, or knowledge that a criminal violation had occurred or was occurring was minimal. The officers' decision to maneuver over or around a locked gate to access private Club property represents a substantial level of intrusion. And finally, the extent of law enforcement needs was low. Accordingly, we hold that the officers' conduct violated Article 1, Section 11. Because the evidence was obtained as a result of an illegal search and seizure, it amounts to the fruit of the poisonous tree; and thus, the trial court abused its discretion when it admitted the evidence at trial. Gyamfi v. State , 15 N.E.3d 1131, 1138 (Ind. Ct. App. 2014).
Conclusion
[21] Under the facts and circumstances of the present case, we conclude that the conduct of the police officers was not reasonable. The officers' entry onto Club property violated Article 1, Section 11 of the Indiana Constitution and therefore, the evidence obtained after the illegal search should not have been admitted at trial. For all of these reasons, we reverse the conviction and remand for proceedings consistent with this opinion.
[22] Reversed and remanded.
Crone, J., concurs.
Vaidik, C.J., dissents with opinion.

We held oral argument in this case at Hamilton Southeastern High School in Fishers, Indiana on November 13, 2017. We thank the faculty, staff, and students for their gracious hospitality. We also thank counsel for their excellent written and oral advocacy.

The State argues that Conn lacks standing to challenge the search under Article 1, Section 11. However, at trial, the State only questioned whether Conn had a reasonable expectation of privacy on Club property, see Tr. p. 37, which goes directly to the State's federal constitutional claim. See Litchfield v. State , 824 N.E.2d 356, 359 (Ind. 2005) (explaining that Indiana courts have explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure under our constitution). Because the State failed to challenge Conn's standing to make the Indiana constitutional claim at trial, it may not raise the issue for the first time on appeal, and therefore, the issue is waived. See Willis v. State , 780 N.E.2d 423, 427 (Ind. Ct. App. 2002) ("Because the State failed to raise standing under the Indiana Constitution and because we cannot raise the issue sua sponte, we proceed to the merits of the state constitutional challenge.").

Benevengo testified that she notified police that there were gunshots and "[y]elling and carrying on." Tr. p. 26. It was Deputy Adam Henson who testified that Benevengo told dispatch that "her dog had drug some animal parts over and thought maybe they were shooting some animals." Id. at 72.

Officer Hagerty was asked if the gate was locked, and he testified, "I believe so." Tr. p. 61. Deputy Henson was asked the same question and responded, "Yes." Id. at 87. Deputy Staat, when asked if the gate was locked, indicated, "I ended up driving back and nobody had unlocked it. I don't believe it was locked, but it was closed." Id. at 111. Additionally, Josh Wright was waiting in his vehicle at the gate for someone to come unlock it. Id. at 75. Based on the testimony at trial, it is reasonable to infer that the gate was in fact locked.