# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 07 2018, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James Harper
Harper & Harper, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Christopher M. Dillard,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 7, 2018

Court of Appeals Case No.
17A-CR-3050

Appeal from the Porter Superior Court

The Honorable Thomas W. Webber, Sr., Judge Pro Tempore

Trial Court Cause No.
64D02-1704-MR-3918

**Mathias, Judge.**

[1] Christopher M. Dillard ("Dillard") filed a motion to suppress incriminating statements he made while in police custody, after three prior requests for

counsel went unheeded. The trial court granted Dillard's motion in part and denied it in part. The trial court then certified its decision, and our court has accepted jurisdiction over Dillard's interlocutory appeal.

We reverse and remand.

## Facts and Procedural History

At approximately 9:30 p.m. on April 19, 2017, Dillard was taken into custody and transported to the Chesterton Police Department for questioning regarding the death of Nicole Gland ("Nicole"), whose body police had found earlier that day. At 10:30 p.m., Chesterton Chief of Police David Cincoski ("Cincoski") entered the interview room where Dillard was being held, and he advised him of his *Miranda* rights. Dillard acknowledged he understood his rights, and he signed a waiver of rights form indicating the same. *See* Supp. Ex. Vol. 3, State's Ex. 1.

Cincoski then began questioning Dillard, which continued for nearly ninety minutes, when the following exchange took place beginning at 11:57 p.m.:

> Cincoski: Okay. So where's the clothes that you were wearing earlier?
>
> Dillard: I already told you.
>
> Cincoski: Okay. Tell me again, please.
>
> Dillard: **I want to just do this lawyer thing.**
>
> Cincoski: Why is that?
>
> Dillard: Because I'm done talking now.

Cincoski: Okay. You don't want to answer any more questions?

Dillard: **No. Because it just keeps going and going.**

Cincoski: Well, part of that process is to verify that you are telling me the truth. Because if you forget what your story is sometimes we can --

Dillard: I don't have a story. I'm trying to give you the best -- that I can for you.

Cincoski: All right. Well, you haven't helped me out thus far.

Dillard: You forgot a water.

Cincoski: I did. I'll get it.

Dillard: That's all right.

Cincoski: **Do you want to talk to a lawyer? Chris?**

Dillard: **Yes.**

Cincoski: **Do you want to talk to a lawyer?**

Dillard: **Yeah**, because it just -- I say things and you're, oh, help me out here, help me out here. You know some of these questions is like, like the product. Like how much did you give her, well, I already covered that like three times now.

Cincoski: Okay.

Dillard: I don't -- I don't get it. Why do you keep asking me three times or if I f[***]ing slept with Nicole, what is -- you know.

Cincoski: Well, I've got to do my job, so -- you don't want to talk anymore? The only way I can help you out. I mean, I can't -- I can't talk to you anymore. If you

|          | want to talk to a lawyer, I can't talk to you anymore. If you want to help yourself out -- |
| --- | --- |
| Dillard: | I just don't get it, man. |
| Cincoski: | What do you want to do? |
| Dillard: | What do you mean, help myself out? I don't -- I don't get that. |
| Cincoski: | Do you want -- do you want to speak to a lawyer? |
| Dillard: | I will take a few more questions. |
| Cincoski: | A few? Just a few more questions? |
| Dillard: | Well, yeah, you know. A guy's thirsty, tired. |
| Cincoski: | All right. I will get you a water. I will be right back. |

Supp. Ex. Vol. 4, Ct.'s Ex. 1 (emphasis added).[1]

[5] After Cincoski returned with a water, Dillard informed Cincoski that he was diabetic, and he requested his diabetes medication which was located at the home he shares with his girlfriend Beverly Galle ("Beverly").[2] Cincoski told Dillard, "[w]ell that, I can't help you with," and then confirmed that Dillard was not having a diabetic reaction, that he did not require emergency services

---

[1] Our review of the transcript of Dillard's interview compared with the video and audio footage of the interview indicate inconsistences on certain time entries and on portions of dialogue between Dillard and Cincoski. For this reason, we cite directly to the video and audio footage of the interview located in the supplemental exhibit volume as Court's Exhibit 1.

[2] Dillard is a Type II diabetic who takes two pills a day for his diabetes and one pill a day for high cholesterol. *See* Supp. Ex. Vol. 4, Def.'s Ex. 15; Tr. p. 131.

to come look at him, and that he did not need something to eat at the moment. *Id.* Cincoski continued questioning Dillard for nearly another hour until 1:05 a.m. when Dillard again requested his diabetes medication. Cincoski reiterated that they did not have any diabetes pills at the police department. Two minutes later, Dillard made a third request for his medication, as well as something to eat, at which point Cincoski left the room and returned with pizza.

[6] After Dillard finished eating, Cincoski returned at 1:28 a.m. to find Dillard lying face down on the floor. Cincoski then questioned Dillard, while he was lying face down on the floor, for the next twenty minutes. Cincoski left the room at 1:48 a.m., and when he returned a minute later, Dillard got up from the floor and sat back down at the desk.

[7] The following exchange then took place beginning at 1:49 a.m.:

Cincoski: Have a seat. I will tell you what happened. Okay. I've caught you in about the last lie I'm going to catch you in. There are no clothes in your garage. So what happened to the clothes? You know what? I don't even want to know what happened to the clothes, because I already know you're lying to me, okay. So why don't we start by getting to the bottom here, because the only person you can help now is you. Because this isn't going to go down -- this is going to go down no matter what happens, so do you want this to go down the right way or do you want this to go down the hard way? Easy or hard, you choose. Do you want to take a lie detector test?

Dillard: No. For what?

Cincoski:   For you to verify that you're telling the truth?

Dillard:   There's nothing.

Cincoski:   Well, I don't have to give you the test, okay? I already know you're lying. There are no clothes in your garage, okay? There are no clothes in your garage.

Dillard:   They are in there.

Cincoski:   No, they're not. Not where you said they were. So why don't you give me a better location as to where they were then if they're not where they're supposed to be. Tell me where they're at?

Dillard:   Look.

Cincoski:   No, you look.

Dillard:   No.

Cincoski:   Yes, you look. I have caught you in way --

Dillard:   **Get me a lawyer.**

Cincoski:   -- too many lies. I've caught you in way too many lies.

Dillard:   **You can't talk. I just asked for a lawyer.**

Cincoski:   Is that the end all to end all?

Dillard:   You know what I'm saying?

Cincoski:   No, I don't know what you're saying. What are you saying?

Dillard:   They could be in the back of that truck though.

Cincoski:   What truck?

Dillard:     My truck.

Cincoski:    Your clothes?

Dillard:     Yeah.

Cincoski:    Oh, I'm sorry.

Dillard:     Well they could be. Cause I was --

Cincoski:    Do you want a lawyer?

Dillard:     Do you see that though?

Cincoski:    Do you want a lawyer?

Dillard:     No, continue.

*Id.* (emphasis added).

[8] A few minutes after this exchange, Cincoski left the room briefly, returned, and then readvised Dillard of his *Miranda* rights. After doing so, the following exchange began at 1:54 a.m.:

Cincoski:    Do you understand your rights?

Dillard:     (nods affiramtively).

Cincoski:    What do you wish to do at this time?

Dillard:     I don't know. What am I supposed to say to that?

                      ***

Cincoski:    So what is your answer?

Dillard:     **Yeah, just give me a lawyer then.**

Cincoski:    Final answer?

> Dillard:      Yeah, I want to go to sleep.

*Id.* (emphasis added).

[9]    Cincoski left the room and returned a few minutes later to ask Dillard for his short size, shirt size, and shoe size. From 2:02 a.m. until 5:42 a.m., Dillard was, for the most part,[3] left alone in the interrogation room. He spent some time sleeping in the chair, with his feet propped up on a second chair, and other times Dillard lay across the two chairs. He also walked around the room and sat at the desk with his head down on the table.

[10]   At 5:42 a.m., Cincoski entered the room, told Dillard to stand up against the wall, and then took several pictures of Dillard. Cincoski then asked Dillard to remove all of his clothing, and he provided Dillard with replacements. Cincoski showed Dillard a search warrant for his clothing and left Dillard with a copy of it. Cincoski left the room at 5:49 a.m., and a second officer brought Dillard a blanket two minutes later.

[11]   Between 5:51 a.m. and 9:05 a.m., Dillard spent time sleeping on one of the chairs, while lying across both chairs, and on the ground using the back of a chair as a pillow. He also picked up and appeared to read the warrant on two occasions, and he walked around the room prior to using the restroom.

---

[3] At 2:55 a.m., Cincoski entered the room and told Dillard to take a nap. Supp. Ex. Vol. 4, Ct.'s Ex. 1. He also explained to Dillard that it's "gonna be a little while before I can let you go or figure out what we're going to do with you." *Id.*

At 9:05 a.m., Cincoski entered the room, Dillard returned to the table, and the following exchange took place:

| | |
|---|---|
| Cincoski: | Hey, Chris. |
| Dillard: | Hey. How are you? |
| Cincoski: | Are you doing okay? |
| Dillard: | Yeah, I'm just tired. |
| Cincoski: | Take a nap, okay? I will have more information for you here in a little bit, okay. Are you hungry for breakfast yet? |
| Dillard: | What time is it? |
| Cincoski: | It is nine. |
| Dillard: | Man, I have been here for a long time, man. |
| Cincoski: | Yeah. It will be just a little bit longer. |
| Dillard: | It will? |
| Cincoski: | Yeah. Do you want some breakfast? |
| Dillard: | Yeah, I probably should eat something. |
| Cincoski: | What would you like? |
| Dillard: | Ah, I don't know. What -- |
| Cincoski: | I'm not making anything. Sorry -- |
| Dillard: | I'm not picky. |
| Cincoski: | What do you want? What do you generally eat? What would you eat, an Egg McMuffin or something? |

Dillard: Yeah, that's fine.

Cincoski: How many you want?

Dillard: One.

Cincoski: One, two?

Dillard: Two. Yeah. **Hey uh, there is no word on my -- on the diabetes pills, are there?**

Cincoski: **No, I've not heard on that yet.**

Dillard: **Can you guys get ahold of [Beverly]?**

Cincoski: Yes, I can call her. Do you need OJ, orange juice?

Dillard: No, I -- I don't like to drink orange juice with [the pills].

Cincoski: No, no, no, no, no, no, with your breakfast.

Dillard: Oh, no, water will be all right.

Cincoski: I will call [Beverly] in a minute, okay?

Dillard: And then, I don't get to talk to her or anything, do I? Not allowed to talk to her at all?

Cincoski: Not right now. Let me give her a call because it's going to be drive time before she can get here. Does she know where this stuff is at?

Dillard: Yeah, she knows where it's at. The -- I just want to have a talk with her. Quit f[***]ing around and I'm going to talk with you here in a minute.

Cincoski: Pardon?

Dillard: I'm going to talk with you. Can you give me five minutes with [Beverly]? Then I, you know, I'm going to talk with you --

> Cincoski: Yep.
>
> Dillard: -- quit f[***]ing around, f[***]ing, this horsing around.
>
> Cincoski: You want to talk with [Beverly] first?
>
> Dillard: Yeah. I fucked up bad.

*Id.* (emphasis added).

[13] Cincoski then called Beverly and asked her if she should would bring in Dillard's medication. Cincoski also asked Beverly if she would do him a favor and speak with Dillard because he had "shut down" during the night. Tr. p. 132. But he explained the decision was entirely up to her. At 10:13 a.m., after Beverly arrived, Cincoski entered the room and gave Dillard his medication. He also told Dillard that Beverly had agreed to speak with him for five minutes, but that the room was recorded and there was no privacy. Beverly entered the room, and Dillard made incriminating statements to her during their eleven-minute interaction.

[14] At 10:32 a.m., Cincoski entered the room and stated, "Chris you said -- I think you said you wanted to talk to me. Do you still want to?" Supp. Ex. Vol. 4, Ct.'s Ex. 1. Dillard acknowledged he wanted to confess, at which point Cincoski stopped him. Cincoski then filled out a waiver of rights form, handed it to Dillard, and then readvised Dillard of his *Miranda* rights at which point the following exchange took place:

> Cincoski: Do you understand those rights?

Dillard:      Is this the same paper?

Cincoski:     Yes, sir.

Dillard:      Now, can I ask, do you think it's best to have a counsel present --

Cincoski:     I cannot --

Dillard:      -- honestly.

Cincoski:     -- advise. I cannot advise.

*** 

Dillard:      Anything I say can be used against me in court?

Cincoski:     It can.

Dillard:      When will I get to see a lawyer, if I need to see one?

Cincoski:     Well, one can be appointed for you. One can -- do you have the means to retain counsel?

Dillard:      No. But one will be appointed for me, right?

Cincoski:     Yes, sir.

Dillard:      That's what I just don't understand.

Cincoski:     If you do not -- if you do not have the means when -- when and if -- if and when you go to court, the judge will ask you if you have an attorney. If you do not have one, they will ask you if you need one, and he will swear you in and ask you a few questions to see if you qualify for counsel.

Dillard:      Gosh -- a big decision, because you're going to do what we did all over again last night, right?

Cincoski:     Do we have to do it all over again?

Dillard: Well, we have to figure out where this was and that was, and who, what and the other said.

Cincoski: Do we have to go through every single thing we went through last night? I will be honest with you, no.

Dillard: Because I don't want to -- you know, I will end up being here another 24 hours.

Cincoski: No, sir. I absolutely guarantee you will not be here that --

Dillard: I know I have already been here over 12, right? Getting close to it.

Cincoski: Exactly at. Well a little bit more, actually. We started talking 12 hours ago.

Dillard: I'm thinking, thinking.

Cincoski: Do you want me to give you a moment to think?

Dillard: Yeah. Yeah. I will need a minute. I'm just trying to think.

Cincoski: Okay. Do you want -- do you want -- do you want a today a minute or do you want a last night's minute?

Dillard: I don't even know -- I can't even remember.

Cincoski: I know.

Dillard: Today I'm a little bit better.

Cincoski: Why don't you just -- you think about it and I will come back in a couple of minutes, okay? All right?

Dillard: Yep.

*Id*.

Cincoski briefly left the room, and when he returned, Dillard told him, "Yeah, I don't want to answer any more questions. I already did -- everything that I can remember." *Id.* Dillard remained in the room until 12:09 p.m., when he was taken to a facility to complete a search warrant for his DNA, blood, and a urine sample.

On April 21, 2017, the State charged Dillard with Nicole's murder. On July 31, Dillard filed a motion to suppress the statements he made while in police custody, and on August 29, Dillard filed an amended motion to suppress: (1) all statements he made to law enforcement after he first invoked his right to counsel; and (2) all statements he made to Beverly while he was in police custody. The trial court held a hearing on the motion to suppress on October 26, after which it took the matter under advisement.

On November 6, the trial court granted Dillard's motion in part, and denied it in part. Specifically, the court suppressed Cincoski's initial interview of Dillard, but it did not suppress Dillard's conversation with Beverly or his subsequent statements to Cincoski. Dillard now brings this interlocutory appeal.

## Standard of Review

Our supreme court has explained that a "trial court's decision regarding admissibility of a confession or incriminating statement is controlled by determining from the totality of the circumstances whether the statement was given voluntarily, rather than through coercion or other improper influence so

as to overcome the free will of the accused." *Hartman v. State*, 988 N.E.2d 785, 787–88 (Ind. 2013). And we review a trial court's denial of a motion to suppress a defendant's confession or incriminating statements in a manner similar to other sufficiency issues. *Id.* at 788. That is, "there must be substantial evidence of probative value in the record to support the trial court's decision." *Id.* In making this decision, we do not reweigh the evidence, and we will consider conflicting evidence in a light most favorable to the trial court's ruling. *Id.* However, unlike other sufficiency matters, we may also consider uncontested evidence that is favorable to the defendant. *Mundy v. State*, 21 N.E.3d 114, 117 (Ind. Ct. App. 2014). Within this sufficiency review, we review the trial court's conclusions of law *de novo*. *Hartman*, 988 N.E.2d at 788.

## Discussion and Decision

[19] Dillard argues that the trial court erred when it denied, in part, his motion to suppress. Specifically, he contends that *all* of the statements he made, including the statements to Beverly, after first invoking his right to counsel were obtained in violation of *Miranda* and were not made voluntarily. The State contends that Dillard's statements to Beverly did not violate *Miranda* and were made voluntarily because those statements were made at Dillard's request. The State further maintains that Dillard's subsequent statements to Cincoski did not violate *Miranda* because they were volunteered by Dillard and were not made in response to police questioning.

The Fifth Amendment of the U.S. Constitution, incorporated to the States by the Fourteenth Amendment, guarantees an individual the right to be free from self-incrimination.[4] *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Within this right, the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 469 (1966), held that an individual must be informed of his right to have counsel present during a custodial interrogation. Interrogation, under *Miranda*, "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Law enforcement conduct that is "reasonably likely to elicit an incriminating response" is determined from the suspect's perspective, and not the intent of the police. *Id.*

The *Miranda* Court further held that when an "individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." 384 U.S. at 474. Although police stations are not required to "have a 'station house lawyer' present at all times to advise prisoners[,]" law enforcement must cease

---

[4] We note that Article 1, Section 14 of the Indiana Constitution grants individuals a similar right to be free from self-incrimination; however, Dillard does not make a separate argument under Article 1, Section 14, and therefore, we will not address it. *See Haviland v. State*, 677 N.E.2d 509, 513 n.2 (Ind. 1997).

questioning an individual until he has the opportunity to consult with counsel. *Id.*

[22] In situations, as here, where law enforcement continues questioning an individual after he has indicated he wants an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. When an individual "has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Arizona v. Roberson*, 486 U.S. 675, 686 (1988).

[23] But if the individual on his own "initiates further communication, exchanges, or conversations" with law enforcement, then the individual may be questioned further without counsel present. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The Court later explained that the *Edwards* "rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures." *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990). And subsequent cases from the Court "following *Edwards* have interpreted the decision to mean that the authorities may not initiate questioning of the accused in counsel's absence." *Id.* at 152. Thus, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present[.]" *Id.* at 153.

[24] Here, the State relies on the United States Supreme Court's decision in *Arizona v. Mauro*, 481 U.S. 520 (1987), to support its position that Dillard's statements to Beverly, and his subsequent statements to Cincoski, should be admissible because Dillard voluntarily initiated the conversation with Beverly and then freely made statements to Cincoski.

[25] In *Arizona v. Mauro*, Mauro was arrested, advised of his *Miranda* rights, and then taken to a police station for questioning. At the police station, Mauro told the officers that he did not want to make any more statements without having counsel present, and the questioning ceased. While Mauro was requesting a lawyer, his wife was being questioned by a detective in a different room. Mauro's wife asked to speak to her husband, and the detective, although reluctant, eventually agreed after he discussed it with his supervisor.

[26] The detective was present in the room when Mauro and his wife spoke, and they both knew that their conversation was being recorded. At his trial, Mauro claimed that he had been insane at the time of the crime, and the prosecution introduced the taped conversation between Mauro and his wife as evidence to refute the argument. Mauro sought to suppress the recording, and the trial court refused.

[27] On appeal, the Court explained that "Mauro never waived his right to have a lawyer present[,]" and thus "[t]he sole issue . . . is whether the officers' subsequent actions rose to the level of interrogation." *Id.* at 527. The Court held that under both *Miranda* and *Innis*, Mauro's conversation was not an

interrogation for several reasons: (1) the detective in the room did not ask any questions about the crime; (2) there was no evidence that the decision to allow Mauro's wife to speak to her husband was a "psychological ploy"; and (3) there was no evidence that the officers sent Mauro's wife in to elicit incriminating statements from her husband. *Id.* at 527–28. The Court then explained that "[i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* at 529–30.

[28] The State argues that under *Mauro*, "Dillard's statements to Beverly are admissible at trial." Appellee's Br. at 22. However, the facts in *Mauro* are significantly different from those before us in three key respects. First, before Dillard spoke to Beverly, he had already requested an attorney on three separate occasions during his interrogation, and Cincoski never honored any of his requests. Second, it is evident from the transcript that Dillard wanted Cincoski to contact Beverly to retrieve his diabetes and cholesterol medication. After asking Cincoski for two Egg McMuffins, Dillard commented, "Hey uh, there is no word on my -- on the diabetes pills are there?" Supp. Ex. Vol. 4, Ct.'s Ex. 1.[5] After Cincoski said no, Dillard requested that Cincoski call

---

[5] This was Dillard's fourth request for his medication over an approximate nine-hour time period.

Beverly, as she knew the pills he needed and had them in their shared home. Third, Cincoski allowed Dillard to speak to Beverly only after Dillard had been in the interview room for nearly eleven hours, and only after Dillard notified Cincoski that he would speak to him after he was able to speak to Beverly.

[29] Moreover, Beverly testified at the suppression hearing that when Cincoski called her that morning, he asked her, "Will you do me a favor?" Tr. p. 132. Cincoski then proceeded to explain to Beverly that "during the night" Dillard had "shut down and he refused to talk." *Id.* Cincoski then told Beverly that if she would come in and meet with Dillard for five minutes, then "Dillard had told [Cincoski] that he would talk to them[.]" *Id.* Thus, the conversation between Beverly and Dillard became the "functional equivalent of interrogation" because Cincoski's words and actions demonstrate that he knew, or should have known, that the conversation was "reasonably likely to evoke an incriminating response" from Dillard. *Innis*, 446 U.S. at 301. For all of these reasons, we do not find *Mauro* controlling.

[30] Dillard cites to our supreme court's decision in *Hartman* to support his position that *all* of the statements he made after he first invoked his right to counsel should be suppressed. In that case, Hartman was taken into police custody on burglary charges. *Hartman*, 988 N.E.2d at 786. During a subsequent interview, law enforcement also questioned Hartman about his father who was missing at the time. The detective advised Hartman of his *Miranda* rights, Hartman requested to speak to an attorney, and all questioning stopped.

[31] The next day, the detective executed two search warrants at a residence and found the body of Hartman's father. At approximately 1:00 a.m. the next morning, the detective had Hartman brought into the jail's intake area and read him the two search warrants after informing Hartman that he was required to do so "by law." *Id.* at 787. The detective then asked Hartman if he had any questions, and Hartman subsequently spoke with detectives and made incriminating statements after again being read his *Miranda* rights. Hartman moved to suppress his statements, and the trial court denied the motion.

[32] On appeal, our supreme court reversed the decision of the trial court for several reasons. *Id.* at 789–91. The *Hartman* court initially noted that "the defendant remained in police custody, in a police-dominated atmosphere in which there are 'inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely.'" *Id.* at 789 (quoting *Miranda*, 384 U.S. at 467).

[33] The court also found it concerning that "despite the defendant's request for counsel, he had not been provided the opportunity to consult with an attorney prior to the police approaching him to read the search warrants." *Id.* Moreover, the court explained that based on Hartman's previous experience, he had no reason to believe that another request "for counsel would bring dealings with the police to a halt. In fact, the defendant's experience two days earlier, when his request for counsel was unproductive, could well have led him to the opposite conclusion—that a request for counsel would not be honored prior to further police dealings." *Id.*

[34]   The court also concluded that Hartman's statement to the detective "was in direct response to the officer's question rather than a separate, independent initiation of further conversation by the defendant." *Id.* at 790. The *Hartman* court further noted that the early-morning timing of the detective's initiation of a conversation with Hartman "was likely the result of police coercion[,]" primarily because the search warrants had been executed earlier that afternoon. *Id.* And by the detective improperly telling Hartman that he was required "by law" to read him the search warrants, "the detective was engaging in a ploy that further supports our conclusion that the police were attempting to evade their obligation to cease questioning of a suspect who had unambiguously requested counsel." *Id.*

[35]   In reversing the trial court's denial of Hartman's motion to suppress, our supreme court acknowledged that "an accused's knowing and voluntary resumption of dialogue with police following being re-read such [*Miranda*] warning[s] is not constitutionally infirm when the accused himself reinitiates conversation," but not "when conversation is reinitiated by police, as it was here." *Id.* However, the court held that even if it had determined that Hartman reinitiated the conversation with law enforcement, his confession was still involuntary based on the totality of the circumstances. *Id.* The *Hartman* court concluded that "when an individual has invoked his right to counsel, it becomes all the more necessary to respect the fine line between constitutionally permissible interrogation techniques and impermissible police coercion." *Id.*

[36] Here, unlike in *Hartman*, law enforcement did not cease questioning Dillard after he unequivocally requested counsel. Dillard requested counsel at 11:57 p.m., and questioning continued. He then requested counsel again at 1:50 a.m., and questioning continued. After being readvised of his *Miranda* rights a second time, Dillard again requested counsel at 1:55 a.m., at which point Cincoski left the interrogation room, only to return three more times throughout the night.[6]

[37] At 9:05 a.m., Cincoski re-entered the interrogation room. Significantly, at this point, Dillard's three requests for counsel had gone unheeded. Thus, there was no reason for Dillard to believe that a fourth request for a lawyer would cease his interactions with law enforcement. *See Hartman*, 988 N.E.2d at 789. Dillard had also, to this point, been in custody for nearly eleven hours, he had not had the opportunity to consult with anyone outside of Cincoski, and he had been without his diabetes medication that he previously asked for on three occasions. All of these facts taken together likely created an environment of significant coercive pressure on Dillard when Cincoski entered the interrogation room that morning. *See Miranda*, 384 U.S. at 474 ("Without the right to cut off

---

[6] The State asserts that Dillard then "slept for several hours[,]" Appellee's Br. at 19, however, a review of the audio and video footage indicates that the State's assertion is overstated. Rather, Cincoski entered the room: at approximately 2:00 a.m. to ask Dillard for his clothing and shoe size; at approximately 2:55 a.m. where he told Dillard to take a nap because it's "[g]onna be a while before I can let you go or figure out what we're going to do with you"; and finally at approximately 5:42 a.m. where he took several pictures of Dillard, asked Dillard to remove all of his clothing and provided him with replacements, and then handed Dillard a copy of the search warrant for his clothing. Supp. Ex. Vol. 4, Ct.'s Ex. 1. Moreover, there are several increments of varying length during this time period where Dillard walked around the room, read the search warrant, and used the restroom. And at times Dillard *may* be sleeping, he is either lying across two chairs, sitting in a chair with his head on a table, or lying on the floor using the back of a turned over chair as a pillow. This is hardly meaningful rest; it approaches sleep deprivation.

questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.")

[38] Despite these circumstances, the trial court in its order concluded that after Cincoski entered the interrogation room at 9:05 a.m., "Dillard wanted to talk with [Beverly] with whom he lived[,]" Appellant's App. p. 49, and that after his incriminating statements to Beverly "Dillard wanted to talk to [Cincoski]." *Id.* at 50. However, this ignores the fact that Cincoski entered the room, told Dillard "I will have more information for you here in a little bit," and then asked if he was hungry for breakfast. Supp. Ex. Vol. 4, Ct.'s Ex. 1. The following conversation then took place:

| | |
|---|---|
| Dillard: | [] Hey uh, there is no word on my -- on the diabetes pills, are there? |
| Cincoski: | No, I've not heard on that yet. |
| Dillard: | Can you guys get ahold of [Beverly]? |
| Cincoski: | Yes, I can call her. Do you need OJ, orange juice? |
| Dillard: | No, I -- I don't like to drink orange juice with [the pills]. |
| Cincoski: | No, no, no, no, no, no, with your breakfast. |
| Dillard: | Oh, no, water will be all right. |

*Id.*

[39] Simply said, Dillard never waived his thrice-invoked right to have an attorney present. *Cf. Owens v. State*, 732 N.E.2d 161, 163–64 (Ind. 2000) (holding that the trial court did not err in admitting the defendant's confession where the police stopped questioning the defendant after he asked for an attorney, and when the officer reentered the room, the defendant asked what could happen if he was guilty of the crime and then confessed). Moreover, Dillard's request for Cincoski to call Beverly was in order to receive his medication. It was only *after* Cincoski agreed to call Beverly that Dillard remarked, "Yeah, she knows where [the pills are] at. The -- I just want to have a talk with her. Quit f[***]ing around and I'm going to talk with you here in a minute . . . . I'm going to talk with you. Can you give me five minutes with [Beverly]? Then I, you know, I'm going to talk with you[.]" Supp. Ex. Vol. 4, Ct.'s Ex. 1.

[40] And although the conversation initiated that morning by Cincoski was not at the outset directly related to the case, its alleged innocuousness is more than offset by the fact that: (1) Dillard's three requests for counsel had thus far been ignored; (2) Dillard had been kept in a small interrogation room, without access to anyone other than law enforcement, for almost eleven hours; (3) Dillard's requests for his medication had been denied three times; and (4) part of Dillard's questioning had taken place with him lying face down on the floor of the room, trying to rest. Even if we were to conclude that he initiated further communication leading to his incriminating statements, Dillard never knowingly or voluntarily waived his right to counsel based on the jarring totality of the circumstances outlined above.

## Summary

Because of the lengthy recounting of Dillard's interrogation above, it is important to return to the initiation of that interrogation and to summarize, both for context and for the instructions contained in our conclusion below. Dillard was taken into custody at approximately 9:30 PM on April 19, 2017. His interrogation began at approximately 10:30 PM, when he was properly *Mirandized* and waived his rights under *Miranda*. Then, at approximately 11:57 PM, Dillard made the first of his three requests for counsel. The trial court suppressed all his interrogation from 10:30 PM until he spoke with Beverly at approximately 10:13 AM the next day, April 20, 2017, while obtaining his medication from her. The trial court did not suppress Dillard's statements to Beverly or those he made in his ensuing interrogation by Officer Cincoski after he was re-Mirandized on April 20, 2017.

## Conclusion

The trial court erred when it suppressed the statements Dillard made to Cincoski prior to Dillard's first invocation of his right to counsel. Dillard's conversations with Cincoski and Beverly after he first invoked his right to counsel constituted impermissible continuing interrogation in derogation of the requirements set forth in *Miranda* and *Edwards*. Moreover, because of the totality of the circumstances surrounding Dillard's custodial interrogation, he never voluntarily waived his right to counsel, and thus his incriminating statements were not made voluntarily.

[43] Consequently, based on the unique facts and circumstances before us here, all of Dillard's statements made after he first invoked his constitutional right to counsel must be suppressed. We therefore reverse the trial court's determinations concerning the suppression of Dillard's testimony. On remand, we order all of the statements Dillard made during his interrogation by Officer Cincoski suppressed, but only from the time Dillard first requested the assistance of counsel at approximately 11:57 PM on April 19, 2017 through the cessation of his interrogation on April 20, 2017, including all statements Dillard made to Beverly.

[44] Reversed and remanded for further proceedings consistent with this opinion.

Bailey, J., and Bradford, J., concur.