FILED

Apr 08 2019, 10:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

A. David Hutson
Hutson Law Office, LLC
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William Washburn,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 8, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2073<br><br>Appeal from the<br>Clark Circuit Court<br><br>The Honorable<br>Bradley B. Jacobs, Judge<br><br>Trial Court Cause No.<br>10C02-1710-F4-91 |

**Kirsch, Judge.**

[1] William Washburn ("Washburn") appeals his convictions after a jury trial for possession of methamphetamine[1] as a Level 5 felony and possession of a syringe[2] as a Level 6 felony. On appeal, he raises the following restated issue: Whether the trial court abused its discretion by admitting into evidence items seized during the warrantless search of a locked safe found in Washburn's car, when he alleges that search violated his rights under Article 1, Section 11 of the Indiana Constitution.

[2] We affirm.

## Facts and Procedural History

[3] On or about September 20, 2017,[3] Officer Tom O'Neil ("Officer O'Neil") of the Jeffersonville Police Department was "involved in a narcotics investigation" that targeted Washburn. *Tr. Vol. 1* at 12. Around 2:45 p.m., Officer O'Neil, who had participated in hundreds of narcotics investigations, was on patrol in Clark County, Indiana, when he saw Washburn's "vehicle travel left of center and utilize the middle of the roadway for approximately two blocks." *Id*. at 168; *Appellant's App. Vol. 2* at 16, 20. After pulling over Washburn's vehicle, Officer O'Neil exited his patrol car, approached Washburn, and requested

---

[1] *See* Ind. Code § 35-48-4-6.1.

[2] *See* Ind. Code § 16-42-19-18.   .

[3] While the State maintains that Washburn was stopped on September 27, 2017, the charging information sets forth the date as September 20, 2017. *Appellant's App. Vol. 2* at 14-17.

identification from Washburn and his passenger.[4]  *Tr. Vol. 1* at 13.  Officer

O'Neil noted that Washburn "was nervous," and "his whole posture was not

consistent with the innocent motoring public."  *Id.*  Washburn was "shaking to

the point where he couldn't even get his driver's license out without issues.  Um

he wouldn't make eye contact with me . . . breathing heavy . . . he kept reaching

towards the backseat."  *Id*. at 171-72.  Once he received Washburn's

identification, Officer O'Neil ran a routine warrant check.  *Id*. at 13.

[4]     Officer O'Neil asked for backup and requested that a K-9 unit assist at the

scene.  The results of the warrant check revealed that an active warrant had

been issued in Kentucky for Washburn's arrest on an escape charge.  Officer

O'Neil placed Washburn under arrest, and because Washburn's car was

blocking traffic, Officer O'Neil summoned a wrecker to tow the vehicle.

Around that same time, Sergeant Dan Lawhorn ("Sergeant Lawhorn"), the

supervisor of the Jeffersonville Police Department's Narcotics Unit, arrived as

backup.

[5]     Clarksville Police Department Sergeant Tony Lehman ("Sergeant Lehman"),

an officer who routinely used his trained K-9 to assist in narcotics

investigations, arrived at the scene about four to six minutes after being called.

Officer O'Neil informed Sergeant Lehman about the "criminal indicators," and

---

[4] A male passenger was in Washburn's car when the car was stopped.  Officer O'Neil testified that he obtained the passenger's information and "made sure he was clear." *Tr. Vol. 1* at 182.  The passenger "consented to . . . a check of his person.  He didn't have any [sic] illegal, no reason to detain him or arrest him.  So he was released from the scene on foot." *Id*.

Officer O'Neil returned to speak with Washburn while Sergeant Lehman walked his K-9 around Washburn's vehicle. *Id*. at 171. Soon thereafter, the K-9 jumped into Washburn's car through an open window and indicated that narcotics were present in a backpack located in the back seat. Sergeant Lawhorn removed the backpack and found a small locked safe inside. *Id*. at 172. Sergeant Lawhorn moved the safe away from the backpack, and the K-9 sniffed the two items separately. This time, the K-9 did not alert on the backpack; instead, "it hit on the safe, it gave a positive alert for the odor of narcotics." *Id*.

[6] Upon seeing the safe, Washburn "became confrontational telling, [the officers they] couldn't search it, [they] weren't allowed to search it." *Id*. at 15. Washburn refused to give the officers "the code or key to it." *Id*. Nevertheless, the officers forced the safe "open with a pry bar at which time [Officer O'Neil] located . . . suspected methamphetamine and a firearm that was listed . . . as stolen." *Id*. The officers also found a digital scale inside the safe. The drug-like substance found in the safe tested positive for methamphetamine. Officer O'Neil transported Washburn to jail.

[7] The State charged Washburn with a six-count information: Count I, dealing in less than one gram of methamphetamine as a Level 4 felony; Count II, possession of less than five grams of methamphetamine as a Level 5 felony; Count III, unlawful possession of a syringe as a Level 6 felony; Count IV, possession of paraphernalia as a Class C misdemeanor; Count V, maintaining a common nuisance as a Level 6 felony; and Count VI, unlawful possession of a

syringe enhanced by a prior conviction, a Level 5 felony. *Appellant's App. Vol. 2* at 174. Prior to trial, Washburn filed a motion to suppress, alleging that evidence found by the police during the traffic stop was seized in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Following a hearing, held one day prior to the jury trial, the trial court denied Washburn's motion on both state and federal constitutional grounds, concluding that the search was performed pursuant to the vehicle exception to the warrant requirement and that exception extended to the locked safe found inside the vehicle. *Tr. Vol. 1* at 37. That same day, Washburn filed a "Motion in Limine Regarding Other Crimes, Wrongs, or Acts." *Appellant's App. Vol. 2* at 70. During a hearing held just prior to the start of trial, the trial court granted the motion in limine and ordered that the State could not make any reference to the fact that Washburn was arrested on an outstanding warrant or that the handgun found in Washburn's possession was stolen.

[8] A jury trial was held on June 5 and June 6, 2018, and among the exhibits offered by the State were the following: Exhibit 2, the firearm; Exhibit 3, the digital scale; Exhibit 4, a large clear plastic bag, which had held Exhibits 5 and 6; Exhibit 5, two small green plastic baggies that, together, contained less than one gram of methamphetamine; Exhibit 6, multiple empty green plastic baggies, similar to those in Exhibit 5, some of which contained trace amounts of methamphetamine; and Exhibit 7, a syringe. *Tr. Vol. 1* at 176-77. Those exhibits were admitted over Washburn's continuing objections. At the close of

evidence, only three counts of the charging information were submitted to the jury.[5] *Id.* at 231-37. Of those charges, the jury could not reach a verdict on Count I, the Level 4 dealing charge, but found Washburn guilty on Counts II and III, the Level 5 felony possession of methamphetamine charge and the Level 6 felony possession of a syringe charge, respectively. *Appellant's App. Vol. 2* at 134-36. The trial court sentenced Washburn to concurrent, fully-executed terms of three years (Count II, possession of methamphetamine) and one year (Count III, possession of a syringe). Washburn now appeals his convictions.

# Discussion and Decision

[9] Washburn is appealing after a completed trial; therefore, the issue is whether the trial court abused its discretion in admitting the challenged evidence. *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). "Because the trial court is best able to weigh the evidence and assess witness credibility," this Court will "only reverse 'if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015) (quoting *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014)); *see also Conn v. State*, 89 N.E.3d 1093, 1097 (Ind. Ct. App. 2017) ("When reviewing a trial court's ruling on the admissibility of evidence resulting from an allegedly illegal search, we do not reweigh the evidence, and

---

[5] Count VI, the Level 5 felony possession of a syringe enhancement, was dismissed on the State's oral motion. *Tr. Vol. 1* at 215-16; 241. It appears from the record that the remaining charges were dismissed prior to trial. *Id.* at 247-48.

we consider conflicting evidence most favorable to the trial court's ruling"), *trans. denied*. The trial court's resolution of questions of law is reviewed de novo. *Pinner v. State*, 74 N.E.3d 226, 229 (Ind. 2017). The trial court's ruling will be sustained on any reasonable basis apparent in the record, whether or not relied on by the parties or the trial court. *Jeter v. State*, 888 N.E.2d 1257, 1267 (Ind. 2008), *cert. denied,* 555 U.S. 1055 (2008).

[10] Washburn contends that Exhibits 2 through 7 were improperly admitted over his continuing objection because that evidence was seized from the locked safe in violation of Article 1, Section 11 of the Indiana Constitution.[6] Washburn does not question the officers' use of a K-9 on the vehicle's exterior, their removal and emptying of the backpack, or the use of the K-9 to detect the odor of illegal drugs inside the safe. *Tr. Vol. 1* at 33-35. Washburn challenges only the use of a pry bar to open the locked safe found inside the backpack after the K-9 had isolated it as the source of the odor of illegal drugs. *Appellant's Br*. at 9-14.

[11] Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable

---

[6] In his motion to suppress, and objection at trial to the admission of Exhibits 2, 3, 4, 5, 6, and 7, Washburn claimed that the police search violated his rights under both Article 1, Section 11 of the Indiana Constitution and the Fourth Amendment to the United States Constitution. While the trial court found that the police search did not violate either the Indiana Constitution or the United States Constitutions, on appeal Washburn challenges the trial court's determination only as to the Indiana Constitution.

cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"Although its text mirrors the Fourth Amendment to the United States Constitution, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently." *State v. Crager*, 113 N.E.3d 657, 664 (Ind. Ct. App. 2018) (citing *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014)), *trans. denied*.

[12] In *Litchfield v. State*, our Supreme Court explained the groundwork required to object under Article 1, Section 11. 824 N.E.2d 356 (Ind. 2005). The Supreme Court "explicitly rejected" the Fourth Amendment's "expectation of privacy as a test of the reasonableness of a search or seizure," emphasizing, "The legality of a governmental search under [Section 11 of] the Indiana Constitution turns on an evaluation of the *reasonableness* of the police conduct under the totality of the circumstances." *Id*. at 359 (emphasis added). Our Supreme Court opined "that the totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." *Id*. at 360. "One factor that may render a search unreasonable is an arbitrary selection of the subject." *Id*.

[13] The *Litchfield* Court laid out a three-factor test for evaluating whether, under the totality of the specific circumstances of a case, police conduct was objectively reasonable. *Id*. at 361. The reasonableness of a search or seizure was deemed

to turn on a balance of: "1) the degree of concern, suspicion, or knowledge that a violation has occurred[;] 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities[;] and 3) the extent of law enforcement needs." *Id*. None of these factors is dispositive; they must be considered together, considering the facts of a search, in order to arrive at a conclusion about the reasonableness of police conduct. *Id*.

[14] Washburn contends that the State proved no exigency or law enforcement need requiring the safe to be searched before a warrant could be obtained. *Appellant's Br*. at 10. During the suppression hearing, the trial court, even as it found that the search of the safe was reasonable, agreed that a "warrant would have been the preferred method of getting access to the locked container." *Tr. Vol. 1* at 35. Those factors, however, do not impact our analysis. Our Supreme Court has made clear that an inquiry under Article 1, Section 11 applies to any search, regardless of whether a warrant was issued. *Watkins v. State*, 85 N.E.3d 597, 600 (Ind. 2017) (holding that "a search warrant's execution is axiomatically a 'search,' so it triggers Section 11's protection"). Thus, the inquiry here is not whether officers faced "exigency" hindering them from obtaining a warrant for the safe, but whether on the totality of the facts their decision to use the pry bar was reasonable under *Litchfield*'s three factors. *Id*.

[15] "In determining reasonableness under Section 11, we recognize that Indiana citizens are concerned not only with personal privacy but also with safety, security, and protection from crime." *Saffold v. State*, 938 N.E.2d 837, 840 (Ind. Ct. App. 2010), *trans. denied*. Accordingly, when government intrusion is

challenged under Section 11, reasonableness under the totality of circumstances also includes considerations of protecting citizens from crime.

[16] Addressing *Litchfield*'s first factor, Washburn, citing to *Eaton v. State*, 889 N.E.2d 297, 299 (Ind. 2008), contends that the degree of concern, suspicion, or knowledge that the police would "find contraband inside the safe" rose only to the level of a "fair probability."[7] *Appellant's Br.* at 11. Washburn understates the officers' level of concern, suspicion, and knowledge that contraband would be found in the safe. Here, Officer O'Neil, who had participated in hundreds of narcotics investigations, was "involved in a narcotics investigation" that targeted Washburn. *Tr. Vol. 1* at 12. Officer O'Neil observed Washburn commit a traffic infraction and pulled over his vehicle. *Appellant's App. Vol. 2* at 16, 20. Washburn "was overly nervous," and "his whole posture was not consistent with the innocent motoring public." *Tr. Vol. 1* at 13, 171. Washburn was "shaking to the point where he couldn't even get his driver's license out without issues," and "he wouldn't make eye contact" with Officer O'Neil. *Id.*

---

[7] In his brief, Washburn states, "Probable cause *means* that there is a 'fair probability' that contraband will be found in a place. *Appellant's Br.* at 11 (citing *Eaton v. State*, 889 N.E.2d 297, 299 (Ind. 2008)) (emphasis added). From this, Washburn concludes, "Thus, police had knowledge that there was a 'fair probability' that there was contraband in the safe." *Id.* Washburn, however, misrepresents our Supreme Court's analysis in *Eaton*. There, our Supreme Court said, "Probable cause *exists* when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Eaton*, 889 N.E.2d at 299 (quoting *U.S. v. Grubbs,* 547 U.S. 90, 95 (2006)) (emphasis added). The Court continued, "Significantly, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (internal quotation marks omitted). Our Supreme Court did not, as Washburn suggests, define probable cause as meaning a "fair probability"; instead, our Supreme Court concluded that even a "fair probability" of criminal activity may be sufficient to establish probable cause. *Id.*

at 171-72. Washburn was breathing heavily, and "he kept reaching towards the backseat." *Id*. at 172.

[17] Officer O'Neil ran a routine warrant check of Washburn, and while awaiting the results, he heard over the police radio about "recent information of [Washburn] trafficking narcotics." *Id*. at 14. Thus, Officer O'Neil requested backup as well as assistance from a K-9 unit. The warrant check revealed that an active warrant for Washburn's arrest had been issued in Kentucky on a charge of escape. Officer O'Neil placed Washburn under arrest and summoned a wrecker to tow the vehicle. Sergeant Lehman arrived at the scene, and while walking his K-9 around Washburn's vehicle, the dog alerted to a backpack in the back seat. Sergeant Lawhorn, who had arrived as backup, removed the backpack from the car and found a locked safe inside. When the K-9 sniffed the two items separately, the K-9 no longer alerted to the backpack; instead, it gave a positive alert for the odor of narcotics in the safe. *Id.* at 172. It is beyond question that the officers' degree of concern, suspicion, or knowledge that drugs were inside the safe was extremely high and added to the reasonableness of the officers' opening of the safe. *Litchfield*, 824 N.E.2d at 360-61.

[18] Turning to the second *Litchfield* factor, Washburn contends that the degree of intrusion was high because officers used force to open the safe. *Appellant's Br*. at 12-13. Washburn cites the following cases, where Indiana courts found the degree of intrusion to be unreasonable under the Indiana Constitution. Washburn argues that opening the locked safe was akin to leaping over a fence and entering a private home, *Carpenter*, 18 N.E.3d at 1002; removing a padlock

and lowering an entrance barrier in a driveway with no trespassing sign, *Mundy v. State*, 21 N.E.3d 114, 119-20 (Ind. Ct. App. 2014); unannounced entry into a closed and occupied pole barn, *Trotter v. State*, 933 N.E.2d 572, 581 (Ind. Ct. App. 2010) (dicta), *abrogated on other grounds*, *Wright v. State*, 108 N.E.3d 307, 317 (Ind. 2018); and jumping over a locked gate barring entry into a private club, *Conn*, 89 N.E.3d at 1096. *Appellant's Br.* at 12.

[19]     Washburn's analysis, however, overlooks the fact that *Litchfield*'s second factor does not focus on entry onto real property but on "the degree of intrusion into the subject's ordinary activities" and the "basis upon which the officer selected the subject of the search or seizure." *Litchfield*, 824 N.E.2d at 360. Here, Washburn was the subject of a narcotics investigation, he was in a car and not a home, a K-9 officer arrived at the scene less than six minutes after Washburn was stopped, and the K-9 alerted to drugs in the safe only after Washburn had already been arrested on an outstanding Kentucky warrant. *Tr. Vol. 1* at 14. The degree of intrusion into Washburn's ordinary activities, if any, was very low.[8] *See Garcia v. State*, 47 N.E.3d 1196, 1201 (Ind. 2016) ("The brief delay needed to conduct a pat-down search prior to Garcia being taken into custody

---

[8] In support of his claim that there was a high degree of intrusion, Washburn emphasizes his "intent to keep people out" by locking the box. *Appellant's Br.* at 12. Concerns for privacy interests are integral in an analysis under the Fourth Amendment; however, they do not control a fact-specific inquiry into overall reasonableness under Article 1, Section 11. *See Litchfield*, 824 N.E.2d at 359 ("Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure.").

would have had little to no additional impact on Garcia's ordinary activities, given that he was already being placed under arrest").

[20] Regarding the third *Litchfield* element, during the suppression hearing, the State, addressing the trial court's inquiry as to whether a search warrant was necessary, argued that in light of the "ready mobileness of a vehicle," and Washburn's arrest, there was a heightened need to immediately open the safe. *Tr. Vol. 1* at 34. The State cited to Washburn's passenger who "conceivably could have tampered" with the safe. *Id*.

[21] Washburn argues that the State did not introduce any evidence to suggest that the safe or its contents were not secure or were in any danger of spoiling while a warrant was obtained. *Appellant's Br*. at 13. Furthermore, there appeared to be no shortage of time to obtain a warrant. *Id*. Our Supreme Court has said, "When armed with probable cause, law enforcement officers are faced with a continuum of ostensibly reasonable activity, from doing nothing to search and seizure. Seeking a warrant is a means for them to reduce the risk that their proposed intrusive activity will fall outside that continuum, and that evidence will have to be suppressed in court." *Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995). Here, Washburn was under arrest, his passenger had been released at the scene, and his car was being towed. While we agree that the law enforcement needs were relatively low, balanced against the concern that drugs would be found in the safe and the minimal intrusion on Washburn's ordinary activities, the weight favors a determination that the search was reasonable. Accordingly, we conclude that the search and seizure of evidence from the safe

was permissible under Article 1, Section 11 of the Indiana Constitution.[9]
*Randall v. State*, 101 N.E.3d 831, 842 (Ind. Ct. App. 2018) (finding a seizure
reasonable under the Indiana Constitution notwithstanding law enforcement
needs being relatively low), *trans. denied*.

[22]   Affirmed.


Riley, J., and Robb, J., concur.

---

[9] Our court has reached a different conclusion when the search is a routine inventory search. See *Brown v. State*, 2019 WL 190527, at *4 (Ind. Ct. App. Jan. 15, 2019) (under Article 1, section 11, an inventory search does not allow law enforcement to open locked containers inside a vehicle "because an inventory search is an exception to the requirement for a search warrant, and the exception was created to protect private property, protect police from claims of missing property, and protect police from danger"); *State v. Lucas*, 859 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) (opening a locked metal box inside a vehicle, pursuant to an inventory search, was unreasonable under Article 1, Section 11), *trans. denied*. "The inventory search is the antithesis of a search under the automobile exception . . .; the inventory search is a mere listing of personal property, while other automobile searches are deliberate searches for evidence. Charles E. Moylan, Jr., *The Inventory Search of an Automobile: A Willing Suspension of Disbelief*, 5 U. Balt. L. Rev. 203, 207 (1976). In other words, "unlike the automobile exceptions which are investigatory in nature and require probable cause, custodial searches are administrative in nature," and do not require probable cause. *Id*. Therefore, the "warrant requirement is inapplicable" to an inventory search and the "reasonableness of the search is based on other criteria." *Id*.