# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 27 2019, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Michael R. Fisher
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dax Lee Bailey,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 27, 2019

Court of Appeals Case No.
19A-CR-1239

Appeal from the
Marion Superior Court

The Honorable
Jennifer Prinz Harrison, Judge

Trial Court Cause No.
49G20-1809-F3-32561

**Kirsch, Judge.**

[1] Dax Lee Bailey ("Bailey") was convicted after a bench trial of dealing in methamphetamine[1] as a Level 3 felony and found to be a habitual offender. Bailey appeals and raises the following restated issue: whether the trial court abused its discretion when it admitted evidence discovered during a search incident to arrest because the initial detention of Bailey and the subsequent search violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

[2] We affirm.

## Facts and Procedural History

[3] On September 20, 2018, Indianapolis Metropolitan Police Department ("IMPD") Officer Ryan Dienhart ("Officer Dienhart") was on patrol in the area of 1050 East Raymond Street in Indianapolis, Indiana at approximately 8:45 p.m. *Supp. Tr. Vol. II* at 5-6. At the time of the suppression hearing, Officer Dienhart had been with IMPD for approximately four-and-a-half years and had received training in the recognition of narcotics; of that time, Bailey had been assigned to the beat that included 1050 East Raymond Street for approximately three years.. *Id*. at 4-6. The area was a "documented high crime area with a high social disorder index." *Id*. at 6. Within a one-block radius around the intersection of Raymond and Shelby Streets there were high rates of reported crimes, including "panhandling at the intersection, misdemeanor thefts from

---

[1] *See* Ind. Code § 35-48-4-1.1.

businesses, robberies of businesses, armed robberies of persons, persons shot, persons stabbed, auto thefts[, and] . . . homicides." *Id.*

[4] While on patrol that night, Officer Dienhart and another officer were at a BP gas station ("the BP") at the corner of Raymond and Shelby Streets in response to an investigation of suspicious people loitering in the parking lot. *Id.* at 6-8. IMPD and the BP had a "trespass agreement," which Officer Dienhart described as a contract between the private business and IMPD where the business gives IMPD permission to "allow officers to become agents of the property . . . and identify and trespass persons from that property without having to go through an employee of the business." *Id.* at 7. The agreement between the BP and IMPD had no restrictions regarding who may be "trespass[ed]" by IMPD. *Id.*

[5] Officer Dienhart and his partner were speaking with some individuals who were at the BP when Officer Dienhart noticed an individual running from the entrance of the BP to a car parked at a gas pump and then run back to the entrance of the BP. *Id.* at 8. Officer Dienhart noticed that the individual, later identified as Bailey, was staggering, "his stride was not steady," and he "seemed to be flailing about." *Id.* Based on his experience as an officer, Officer Dienhart believed Bailey was "under the influence of some sort of intoxicant," and he remembered looking at his partner as they wondered what Bailey was doing and "what was wrong with him." *Id.* at 8-9.

Officer Dienhart and his partner finished the investigation that had brought them to the BP and walked to the car from which they had seen Bailey run back and forth. *Id*. at 9. Officer Dienhart "initiated a consensual encounter with the driver of the vehicle" and asked the driver what he was doing at the gas station, who the person was who had run back and forth from the car, and, in greater detail, what they were doing. *Id*. The driver was not cooperative at first and stated that he did not know the other person's name and that he was just "giving [him] a ride," which Officer Dienhart found unusual and suspicious given the area of high crime. *Id*. As the conversation continued, the driver became more cooperative when Officer Dienhart told the driver "the information he was providing" did not make sense and the driver was going to be detained. *Id*.

As Officer Dienhart was speaking with the driver, he observed in the rear passenger's side seat, in plain view, a black container or case, which had a plastic baggie protruding from it. *Id*. at 10. Officer Dienhart "immediately suspected that that container and case contained either illegal paraphernalia and/or narcotics." *Id*. His suspicions were later confirmed when he searched the car with the driver's consent and found three empty syringes, two baggies of spice, which is synthetic marijuana, a half of an unknown pill, and rolling papers. *Id*. While this interaction between Officer Dienhart and the driver was happening, Bailey approached the car again, and as he did so, he looked "fidgety," his "eyes were darting all about," and when he spoke, his speech was "staggered and not normal." *Id*. at 10-11. Bailey's appearance furthered

Officer Dienhart's suspicion that Bailey was under the influence of "some sort of intoxicant, which [he] suspected to be some type of narcotic drug." *Id*. at 11. Officer Dienhart tried to ask Bailey what he was doing, and Bailey's speech was "rambling" and "inconsistent," making him unable to have a "coherent conversation." *Id*. Officer Dienhart asked Bailey his identity, and Bailey initially provided "deceitful" information. *Id*. at 11-12.

[8] From the time that Bailey returned to the car from the BP and Officer Dienhart made his observations of Bailey's demeanor, Officer Dienhart believed Bailey was detained and not free to leave. *Id*. at 13-15. Although it is not clear when Bailey was made aware of this, he was placed in handcuffs at some point after returning to the car. *Id*. at 14-15. Officer Dienhart placed Bailey in handcuffs based on Officer Dienhart's concerns that they were in a high crime area, the significant safety issues involved with a person being under the influence of an unknown intoxicant, and the need to safely conduct an investigation. *Id*. at 15-16.

[9] Officer Dienhart eventually learned Bailey's name and birthdate and conducted a background search using that information. *Id*. at 12. Through that search, Officer Dienhart discovered that there was an active warrant for Bailey's arrest for felony possession of methamphetamine and placed him under arrest. *Id*. at 12. Officer Dienhart performed a search incident to arrest and found what he believed to be a bag of methamphetamine. *Id*. at 12-13. After Officer Dienhart read Bailey his *Miranda* rights, Bailey told the officer that he had obtained the bag of methamphetamine from an unknown and unnamed individual earlier

that day as a "gift," and he was going to give it to someone else in exchange for help for his family. *Tr. Vol. II* at 24. Forensic examination revealed that the substance Officer Dienhart found on Bailey during the search incident to arrest was methamphetamine. *Id*. at 26-28.

[10] On September 25, 2018, the State charged Bailey with dealing in methamphetamine as a Level 3 felony and possession of methamphetamine as a Level 5 felony. *Appellant's App. Vol. II* at 21. On January 14, 2019, Bailey filed a motion to suppress the evidence arising out his detention and his subsequent search. *Id*. at 55-56. A hearing was held on the motion to suppress, and the trial court subsequently denied the motion. *Id*. at 57, 61. On March 4, 2019, the State filed an allegation that Bailey was a habitual offender. *Id*. at 65-66. A bench trial was held, and with the consent of both parties, the trial court incorporated the testimony from the suppression hearing as part of the record for the bench trial. *Tr. Vol. II* at 21-22. At the conclusion of the trial, the trial court found Bailey guilty as charged but vacated the possession of methamphetamine conviction. On May 8, 2019, Bailey was sentenced to twelve years for Level 3 felony dealing in methamphetamine, and that sentence was ordered enhanced by six years for Bailey's habitual offender status, for an aggregate sentence of eighteen years. *Appellant's App. Vol. II* at 13-14. Bailey now appeals.

# Discussion and Decision

[11] Bailey argues that the trial court erred when it admitted evidence obtained after a search incident to arrest. Because Bailey did not seek an interlocutory appeal of the denial of his motion to suppress but proceeded to trial, we review his claim as one challenging the admission of evidence at trial. *Gerth v. State*, 51 N.E.3d 368, 372 (Ind. Ct. App. 2016) (citing *Carpenter v. State,* 18 N.E.3d 998, 1001 (Ind. 2014)). Our standard of review of a trial court's admission of evidence is an abuse of discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law. *Id*.

[12] Bailey argues that the trial court abused its discretion when it admitted the evidence of methamphetamine that was discovered during the search incident to arrest. Although he concedes that the search incident to arrest itself did not violate any constitutional prohibitions, Bailey contends that the evidence was illegally obtained because Officer Dienhart had no reasonable suspicion of criminal activity to initially detain him, and the encounter between Bailey and Officer Dienhart was not consensual; therefore, the evidence discovered must be excluded as the illegal detention violated the Fourth Amendment to the United States Constitution. Bailey also argues that the evidence should have been excluded because the actions by the police violated Article 1, Section 11 of the Indiana Constitution because the actions of the police were not reasonable because there was no degree of concern, knowledge, or suspicion that a

violation had occurred, his detention was a serious imposition on his ordinary activities, and there was no legitimate law enforcement need to detain him merely because the officers were in a high crime area.

### *Fourth Amendment*

[13] The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. U.S. Const. amend. IV. "'As a general rule, the Fourth Amendment prohibits a warrantless search. When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search.'" *Glasgow v. State*, 99 N.E.3d 251, 257 (Ind. Ct. App. 2018) (citing *Berry v. State*, 704 N.E.2d 462, 465 (Ind. 1998)).

[14] "Encounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do." *Clark v. State*, 994 N.E.2d 252, 261 (Ind. 2013). Consensual encounters in which a citizen voluntarily interacts with a police officer do not compel Fourth Amendment analysis. *Id.* However, nonconsensual encounters do require such analysis and typically fall into two categories: (1) a full arrest lasting longer than a short time, which requires probable cause; and (2) a brief investigative stop, often known as a Terry stop, which requires a lower standard of reasonable suspicion. *Id.*

Law enforcement officers may stop and briefly detain a person if the officer has reasonable suspicion to believe that criminal activity has occurred or is about to occur. *Grayson v. State*, 52 N.E.3d 24, 27 (Ind. Ct. App. 2016) (citing *Holly v. State,* 918 N.E.2d 323, 325 (Ind. 2009)), *trans. denied.* Reasonable suspicion must be comprised of more than hunches or unparticularized suspicions. *Id*. "Taking into account the totality of the circumstances or the whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id*. (citing *Clark*, 994 N.E.2d at 264). In determining whether reasonable suspicion existed, we must examine the facts as known to the officer at the moment of the stop. *Id.* Findings of reasonable suspicion are reviewed de novo, and such review is a fact-sensitive inquiry. *Id.*

In the present case, at the time that Officer Dienhart detained Bailey, the officer had reason to believe that Bailey had committed or was committing the offenses of possession of a narcotic drug and public intoxication. A person who knowingly or intentionally possesses a narcotic drug without a valid prescription commits possession of a narcotic drug as a Level 6 felony. Ind. Code § 35-48-4-6(a). A person commits public intoxication as a Class C misdemeanor when he or she is in a public place in a state of intoxication caused by the person's use of alcohol or a controlled substance if the person endangers his or her own life, breaches the peace, or is in imminent danger of breaching the peace. Ind. Code § 7.1-5-1-3(a)(1), (a)(3).

[17]     When Officer Dienhart first noticed Bailey and the car parked by the gas pump and its driver, he observed Bailey run from the BP entrance to the car and back, and the manner in which Bailey was running caused Officer Dienhart and his partner to wonder if something was wrong with him. *Supp. Tr. Vol. II* at 8. Bailey was staggering, "his stride was not steady," and he "seemed to be flailing about." *Id*. Based on his training and experience, Officer Dienhart believed Bailey was "under the influence of some sort of intoxicant," and he remembered looking at his partner as they wondered what Bailey was doing and "what was wrong with him." *Id*. at 8-9. When the officers walked over to the car parked by the gas pump to inquire into the situation, the driver was initially uncooperative and claimed not to know who Bailey was but that he was just giving Bailey a ride. *Id*. at 9. While Officer Dienhart spoke with the driver, he observed in the rear passenger's side seat, in plain view, a black container or case, which had a plastic baggie protruding from it. *Id*. at 10. Officer Dienhart "immediately suspected that that container and case contained either illegal paraphernalia and/or narcotics," which was a reasonable assumption based on the officer's training and experience. *Id*. Bailey's behavior, which was consistent with intoxication, the fact that Bailey had run back and forth to the car containing the suspected narcotics and was getting a ride from the driver, and the high crime rate of the area all contributed to the officer's reasonable suspicion that criminal activity had occurred or was about to occur. It was also reasonable for Officer Dienhart to believe the black case or container inside the car belonged to Bailey or was in his possession since he was getting a ride from the driver of the car and had recently run back and forth to

the car. Additionally, Bailey's behavior when Officer Dienhart first made contact with him, including being "fidgety," having his "eyes darting all about," and speaking in a staggered and abnormal way, provided further grounds for Officer Dienhart to be suspicious that Bailey was in possession of a narcotic drug. *Id*. at 10-11.

[18] Officer Dienhart also had reasonable suspicion to believe that Bailey was intoxicated in a public place in a manner that endangered his life, was breaching the peace, or was in imminent danger of breaching the peace. When Officer Dienhart approached the car, he had previously observed Bailey staggering and flailing across the parking lot twice and moving in an unsteady manner. *Id*. at 8. Based on his training and experience, Officer Dienhart believed Bailey was "under the influence of some sort of intoxicant," and he and his partner wondered what Bailey was doing and "what was wrong with him." *Id*. at 8-9. Bailey's actions took place in a busy gas station parking lot at nearly 9:00 p.m., and it was reasonable for Officer Dienhart to believe that Bailey was acting in a way that placed him in danger from being hit by a vehicle whose driver might not see him until it was too late and that Bailey lacked the mental or physical capacity to avoid being hit by vehicles in the parking lot. *Id*. at 6. Further, when Bailey approached the car and the officers, his appearance deepened Officer Dienhart's suspicion that Bailey was under the influence of "some sort of intoxicant, which [Officer Dienhart] suspected to be some type of narcotic drug" because of his "rambling" and "inconsistent" speech that made him unable to have a "coherent conversation." *Id*. at 11. Likewise, Bailey's

conduct of "flailing about" could have given rise for Officer Dienhart to suspect that Bailey was either breaching the peace or in imminent danger of doing so. *Id*. at 8. When asked questions about his identity, Bailey also provided "deceitful" information, which added to the officer's suspicion that Bailey may have been involved in criminal activity. We, therefore, conclude that Officer Dienhart had reasonable suspicion to justify the investigatory stop, and Bailey's detention did not violate the Fourth Amendment.

[19] Further, we conclude that the fact that Bailey was placed in handcuffs during the investigatory stop does not elevate it to the level of an arrest requiring probable cause. Looking at the totality of the circumstances, we have already determined that Officer Dienhart had reasonable suspicion to detain Bailey. Additionally, Officer Dienhart testified that he had handcuffed Bailey due to the high crime nature of the area and his concern for officer safety due to Bailey's suspected intoxication from some unknown substance. *Id*. at 15. He also stated that he placed Bailey in handcuffs because of the unknown nature of Bailey's intoxication, Bailey's erratic behavior, and the need to ensure the officer's safety while conducting the investigation. *Id*. at 15-16. As part of a valid *Terry* stop, the investigating officer is entitled to take reasonable steps to ensure his own safety. *Reinhart v. State*, 930 N.E.2d 42, 46 (Ind. Ct. App. 2010). Based on the totality of the circumstances, we conclude that placing Bailey in handcuffs did not elevate the proper investigatory stop into an arrest.

### Indiana Constitution

[20] Article 1, Section 11 of the Indiana Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Although its text mirrors the Fourth Amendment to the United States Constitution, we interpret Article 1, Section 11 of the Indiana Constitution separately and independently. *Washburn v. State*, 121 N.E.3d 657, 662 (Ind. Ct. App. 2019), *trans. denied*. In *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005), our Supreme Court "explicitly rejected" the Fourth Amendment's "expectation of privacy as a test of the reasonableness of a search or seizure," emphasizing that "legality of a governmental search under [Section 11 of] the Indiana Constitution turns on an evaluation of the *reasonableness* of the police conduct under the totality of the circumstances." *Id.* at 359 (emphasis added). Therefore, the reasonableness of search or seizure under Article 1, Section 11, is governed by the balancing of the following factors: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id*. at 361. None of these factors is dispositive; they must be considered together, considering the facts of a search, in order to arrive at a conclusion about the reasonableness of police conduct. *Id.*

[21]     Here, the degree of concern, suspicion, or knowledge that a violation had occurred was high. Officer Dienhart had twice observed Bailey stagger with an unsteady stride and flail about as he ran back and forth from the BP entrance to a car in the parking lot. *Supp. Tr. Vol. II* at 8. Based on his training and experience, Officer Dienhart believed Bailey was "under the influence of some sort of intoxicant." *Id*. When speaking with the driver of the car, the officer saw a baggie protruding from a black container in the seat behind the passenger's seat, and the driver's answers to the officer's questions increased his suspicions that the baggie contained narcotics, which was also heightened due to Bailey's suspected intoxicated state. *Id*. at 10-11. The concern, suspicion, or knowledge that Bailey was engaged in the possession of narcotics was further increased when Bailey was "deceitful" in providing identifying information. *Id*. at 11-12. Additionally, Officer Dienhart testified that he had handcuffed Bailey due to the high crime nature of the area and his concern for officer safety due to the unknown nature of Bailey's intoxication, Bailey's erratic behavior, and the need to ensure the officer's safety while conducting the investigation. *Id*. at 15-16.

[22]     Admittedly, the degree of intrusion imposed on Bailey weighed somewhat against the State because Bailey was handcuffed, but there was no evidence as to how long he was handcuffed before the police learned that he had an active warrant for his arrest. As to the extent of law enforcement needs, Officer Dienhart had seen Bailey engage in erratic and dangerous conduct, which led him to believe that Bailey was intoxicated in a public place, and allowing Bailey

to leave without determining what was causing his behavior may have endangered him or others. Additionally, Officer Dienhart had observed suspected narcotics in the car in which Bailey was a passenger, and when the officer first encountered Bailey, Bailey's speech was rambling and incoherent, and he was not truthful when asked for identifying information, which furthered the officer's suspicion that Bailey was under the influence of some type of narcotic drug. *Id*. at 11. Allowing the driver and Bailey to leave without fully investigating whether there were narcotics in the vehicle could have led to the destruction of evidence. Therefore, additional investigation was necessary before they could be allowed to leave. Bailey asserts that Officer Dienhart detained Bailey solely to conduct a search for warrants. *Appellant's Br*. at 18. However, the evidence showed that Officer Dienhart detained Bailey as part of a narcotics investigation and for safety purposes due to his behavior. Although we agree that the intrusion into Bailey's ordinary activities was relatively high, balanced against the concern and suspicion that Bailey was intoxicated and in possession of narcotics and law enforcement needs to investigate the situation before Bailey could endanger himself or others or destroy the evidence of drugs, the weight of these factors favors a determination that Bailey's detention was reasonable under the totality of the circumstances. We, therefore, conclude that the detention of Bailey was permissible under Article 1, Section 11 of the Indiana Constitution.

[23] Affirmed.

Baker, J., and Crone, J., concur.