


FILED
Mar 17 2025, 9:22 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Anthony Xavier Carr,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

March 17, 2025

Court of Appeals Case No.
24A-CR-1599

Appeal from the Lake County Superior Court

The Honorable Salvador Vasquez, Judge

Trial Court Cause No.
45G01-2212-MR-61

**Opinion by Judge DeBoer**
Judges May and Tavitas concur.

**DeBoer, Judge.**

## Case Summary

After Brittany Smith (Smith) was found fatally shot in her bedroom, detectives began searching for her killer. Although Smith's boyfriend, Anthony Xavier Carr (Carr), initially denied being at Smith's house the day she was found murdered, cell phone records revealed he had been at Smith's house for several hours the morning of her death. A jury found Carr guilty of Smith's murder. For Smith's convictions for murder and the habitual offender enhancement to which he admitted, the trial court imposed an aggregate sentence of sixty-eight years in the Department of Correction (DOC).

Carr appeals, raising three issues:

(1) Whether the trial court abused its discretion by allowing a detective to testify that the evidence in the case did not point to suspects other than Carr;

(2) Whether the trial court abused its discretion by admitting Carr and Smith's text messages from two months before her murder to demonstrate the hostility between them; and

(3) Whether the evidence was sufficient to convict Carr of Smith's murder.

Finding no error, we affirm.

## Facts and Procedural History

[4] In April 2022, Smith and Carr began a dating relationship that was marred with frequent conflict. According to Carr, the couple lived together but went through cycles of breaking up and reconciling. On the afternoon of December 2, 2022, Smith's mother, Frances Morton-Howard (Frances) drove to Smith's house to pick up Smith's children because Carr and Smith were going on a date. That evening, an "upset" Smith called her mother. *Transcript Vol. 4* at 22. Frances heard the couple arguing and Carr "using profanity[,]" including calling Smith profane names. *Id.* at 24. To Frances, Carr sounded upset that Smith refused to take him to his mother's house and he told Smith that he "[had] a gun and drugs on [him]." *Id.* at 25. Smith eventually hung up. Later, Smith called her mother on FaceTime. Then around "11:00 something" that evening, Frances texted Smith but received no response. *Id.* at 28.

[5] Sometime around 9:00 or 10:00 p.m. on December 2, 2022, Carr went to the Home Plate Pub with a handgun. The bartender recognized Carr, whom he knew as Ace, as a frequent customer. Because the bar did not allow patrons to possess firearms, Carr gave his handgun to the bartender for safekeeping. The bartender could not recall anything specific about the handgun other than it had a thin barrel and "it was not a revolver." *Id.* at 114. He returned Carr's handgun to him when he left.

[6] Between approximately 1:00 and 3:00 a.m. on December 3, 2022, Carr left the Home Plate Pub with his handgun, and went to another local bar, Porter's Tap.

Carr's cell phone records indicate that after leaving Porter's Tap, Carr called Smith four times between 3:06 and 3:20 a.m. Between 3:47 and 4:29 a.m., Carr's cell phone records placed his phone at the home of his friend, Jacquelyn Keaton (Keaton). At trial, Keaton testified she drove Carr to Smith's house but did not stay to watch him enter the house. Phone records placed Carr's phone at Smith's house from approximately 4:46 until 7:19 a.m.

[7] At 7:07 a.m., a friend of Smith's placed a video call to Smith. Carr answered the call on Smith's phone but refused to put Smith on the phone when asked. After arguing with Smith's friend, Carr hung up. The friend tried to call several more times over the next thirty minutes, but no one answered.

[8] Around this time, Smith's neighbor across the street was awakened by a loud noise, followed by "two more noises that sounded like gunshots." *Tr. Vol. 4* at 125.[1] Other neighbors frequently shot guns so he believed the noise was from them and he went back to sleep without calling 911.

[9] After leaving Smith's house around 7:19 a.m., Carr's phone was signaled traveling east until 7:32 a.m. then was picked up again at his mother's house at approximately 8:42 a.m.[2] Around 10:30 a.m., Carr returned to the Home Plate

---

[1] The neighbor estimated that this occurred sometime between 7:00 and 8:00 a.m.

[2] Carr's phone stopped transmitting location data between 7:32 and 8:42 a.m. A special agent with the Federal Bureau of Investigation testified that a phone could stop transmitting location data for several reasons, including the phone being turned off or being in airplane mode, or simply, that "there just wasn't

Pub and talked to another customer, Joseph Anderson (Anderson), who noticed that Carr "seemed upset." *Id.* at 181. Carr told Anderson he "did something bad and he might be going to jail for a while." *Id.* When asked why, Carr responded that Anderson "didn't want to be involved." *Id.*

After hearing nothing from her daughter on the night of December 2nd, Frances fell asleep for the night. In the morning, she called Smith repeatedly, but Smith did not answer. Concerned, Frances drove to Smith's house and knocked on the front door around 1:00 that afternoon. When no one answered, Frances went to the back door, discovered it unlocked, and went inside. She found Smith in her bedroom, "sitting up – leaning on the wall . . . with blood splatter on the wall . . . already stiff." *Id.* at 32-33. She called 911. Frances told the police that she had overheard Smith's recent argument with Carr on the phone and that she believed Carr, whom she knew as Ace, was the perpetrator. *Id.* at 47. Despite Smith being shot three times, detectives who searched the scene only found two shell casings—both fired from the same gun. The murder weapon was never recovered.

On December 4, 2022, Carr went to the Hammond Police Department to speak with detectives.[3] Carr told detectives that he and Smith had plans to go out on

data collected during that timeframe." *Tr. Vol. 5* at 249. The agent indicated that "generally" she cannot conclude why a cell phone stopped transmitting signals solely from reviewing the phone records. *Id.*

[3] Although the record indicates that Carr spoke with detectives, the record is unclear as to whether the police requested Carr sit for an interview or whether he went on his own volition.

the night of December 2nd but he noticed his key to Smith's house was missing and he blamed Smith for its disappearance. Carr claimed he asked Smith to take him to his mother's house, but she refused, so his friend gave him a ride. Carr told detectives he did not return to Smith's house that night.

[12] After Carr was arrested on December 15, 2022, he sat for another interview with the detectives. He reiterated that he had been arguing with Smith on December 2nd and did not return to Smith's house that night. When detectives confronted Carr with inconsistencies in his timeline on the morning of December 3rd, Carr changed his story and he admitted he had found a ride back to her house. He also initially told them that he threw his phone away in his friend's garbage can but later told them he lost his phone. His phone was never found.

[13] The State charged Carr with murder on December 16, 2022. Before trial, the State filed a Motion of Intent to Use 404(b) Character Evidence, which included a series of text messages exchanged between Carr and Smith in October 2022. Defense counsel responded with a Motion in Limine to exclude this evidence. At trial, over defense counsel's objection, the trial court permitted the State to introduce these messages:

> Smith: I have nothing to say to you I forgave you for what you did two days ago last night and this when you know d*** well I didn't say s*** wrong and then kick my door in and scare my kids then threaten me we'll gone head she gone kill me the kids my mom sis step dad bros and the people over here smh

Carr: I don't give a f*** about your brothers or your stepdad Biggs

Carr: N****

. . .

Smith: How you gonna fix the door the wood is in pieces

Smith: I don't have no wood glue should I get some

Carr: I'm gone fix it when Eva you tell me to come home

. . .

Smith: I'm not about to listen to talk s*** sorry but no

Carr: I don't give a f*** wat cho feel like none of my friends err played with me like that you neva wanted me to be there an to let you kno if I had a chance to be with somebody I would cuz your nothing to me[.] After you set in the basement with this n**** I had to fake beg you but you gave him errthing np

Carr: Leave my s*** on the couch On my way! An I wail kick your door the f*** in an I'm saying it on text cuz my oh gone bond me out now play with me after this n**** robbed me an his fat a** dead soon as I c him

Carr: He probably with you with Cho dumb thirsty a**

Smith: It will be in the garage

Carr: Nawl f*** that it wasn't in the f***ing garage when I gave it to you I won't my s*** an I'm coming for it you or nobody else can stop me f*** the police my Og got 150000 n**** have my s*** for playing with me or you gone wish y'all as neva born not a threat a promise

Smith: I'm leaving in 10 minutes the key will be in the mailbox

Carr: I'm tripping you can have that an come get your phone I got the 20 he stole but [come] get ur phone after that neva call me again keep having n***** in your basement an telling all my business you gone be lonly

*Ex. Vol. 2* at 138-141 [sic throughout].

[14] During Deputy Prosecutor Tara Villarreal's direct examination of one of the detectives, Lieutenant Christopher Gootee (Gootee), the State asked the following question, to which defense counsel objected and which the trial court overruled:

> Lieutenant, throughout your entire investigation and all the evidence that was collected and obtained during this case, did any of the evidence point toward any other suspect other than Anthony Carr?

*Tr. Vol. 5* at 155.

The State then repeated the question, "[d]id all of the evidence that was obtained throughout this case . . . point to any other suspects other than Anthony Carr?" *Id.* at 156. Gootee answered, "[n]o." *Id.*

[15] The jury found Carr guilty as charged. Outside the jury's presence, Carr admitted he was a habitual offender. The trial court sentenced Carr to sixty years in the DOC for murder and eight years on the habitual offender enhancement for an aggregate sentence of sixty-eight years executed. Carr appeals.

## Discussion and Decision

## 1. Vouching Testimony

[16] Carr argues on appeal that Detective Gootee was allowed to impermissibly testify about Carr's guilt or innocence when he told the jury that the evidence from his investigation did not point to any suspect other than Carr. The State counters that this evidence was merely the detective's investigative deductions that did not go to the ultimate issue of Carr's guilt. The admission and exclusion of evidence rests within the sound discretion of the trial court. *Griffith v. State*, 31 N.E.3d 965, 969 (Ind. 2015). An abuse of discretion occurs when the "trial court's decision is clearly against the logic and effect of the facts and circumstances." *State v. Katz*, 179 N.E.3d 431, 440 (Ind. 2022). "The trial court's ruling will be sustained on any reasonable basis apparent in the record, whether or not relied on by the parties or the trial court." *Washburn v. State*, 121 N.E.3d 657, 661 (Ind. Ct. App. 2019), *trans. denied*.

[17] Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "[w]itnesses may not testify to opinions concerning intent,

guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This testimony is considered an "invasion of the province of the jury in determining what weight they would place upon [a witness's] testimony." *Head v. State*, 519 N.E.2d 151, 153 (Ind. 1988); *see also* Ind. Const. Art. 1, § 19 ("[i]n all criminal cases whatever, the jury shall have the right to determine the law and the facts.").

[18]     Witnesses are allowed to give opinion testimony, which may include "evidence that leads to an [incriminating] inference, even if no witness could state [an] opinion with respect to that inference." *Steinberg v. State*, 941 N.E.2d 515, 526 (Ind. Ct. App. 2011), *trans. denied.* However, this opinion must stop short of the question of guilt. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). In *Williams*, the Indiana Supreme Court found that the testifying officer improperly gave his opinion on the question of guilt by stating he saw Williams involved in a "transaction for cocaine," and there was "zero doubt in [his] mind that that was a transaction for cocaine." *Id.* at 581-82. The Supreme Court explained that the officer's statement informed the jury that Williams's conduct satisfied all three elements of the dealing in cocaine offense: (1) knowingly or intentionally, (2) delivering, (3) cocaine. Although the detective did not expressly state the elements of the offense, "[p]araphrasing all elements of an offense resolves the ultimate issue of guilt[.]" *Id.* at 582. Thus, the detective's statement "[left] nothing for the jury to decide." *Id.*

[19]     In contrast, in *Hill v. State*, our Court allowed testimony of a police officer who told the jury that police had "substantial evidence" on the defendant but "not [] enough evidence" to charge the other two suspects. 137 N.E.3d 926, 942 (Ind. Ct. App. 2019), *trans. denied.* We found that substantial evidence is "not a statement regarding every element of the offense[.]" *Id.* at 943. In other words, the testimony regarding evidence gathering did not resolve the *ultimate* issue: the defendant's guilt or innocence. *Id.*

[20]     The State charged Carr with murdering Smith. Before he can be convicted of this crime, the State must prove every element of the crime charged beyond a reasonable doubt. *Richey v. State*, 210 N.E.3d 329, 341 (Ind. Ct. App. 2023)*, reh'g denied*. The crime of murder is defined as: "[a] person who knowingly or intentionally kills another human being[.]" *Roberson v. State*, 982 N.E.2d 452, 457 (Ind. Ct. App. 2013); Ind. Code § 35-42-1-1(1). To convict Carr of murder, the jury must not only determine if Carr killed Smith but also whether he had the requisite knowledge or intent to do so. *See Stubbers v. State*, 190 N.E.3d 424, 432 (Ind. Ct. App. 2022), *trans. denied*. Gootee did not testify to Carr's mental state, leaving this determination within the province of the jury. Gootee's testimony also focused on his investigation and the evidence collected for prosecution, not on Carr's guilt or innocence. "Evidence required for prosecution is quite different from opinion evidence regarding guilt or innocence." *Hill*, 137 N.E.3d at 943. Thus, we conclude that Gootee's

statements did not constitute improper vouching and the trial court did not abuse its discretion in allowing this testimony.

## 2. Prior Bad Acts

"Indiana Evidence Rule 404(b)(1) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Attkisson v. State*, 190 N.E.3d 447, 451 (Ind. Ct. App. 2022), *trans. denied*. Such evidence, however, may be admissible for other purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evidence Rule 404(b)(2). The test for assessing the admissibility of 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its unfair prejudicial effect pursuant to Indiana Evidence Rule 403. *Attkisson*, 190 N.E.3d at 451-52.

## A. Texts Were Not Used To Show Propensity

Carr challenges the admission of text messages exchanged in October 2022 between him and Smith, arguing they "only showed Carr's propensity to act violently and commit murder," thereby running afoul of Rule 404(b). *Appellant's Br.* at 18. The October 2022 text messages referred to Carr kicking in Smith's door a few months before the murder, him threatening to do it again,

and him telling Smith that another man is "dead soon as I [see] him." *Ex. Vol. 2* at 140. In that same text message chain, Carr texted Smith that if he didn't get his belongings back, "I'm coming for it you or nobody else can stop me f*** the police . . . you gone wish y'all [was] neva born not a threat a promise." *Id.* at 141.

[23] In response, the State argues that the evidence was properly admitted under one of the exceptions to Rule 404(b) to show "motive, intent, the relationship and absence of mistake or lack of accident." *Tr. Vol. 5* at 74. Carr contends that he did not put into issue intent, absence of mistake, or lack of accident, thus, these text messages could not be admitted under those exceptions. However, the State counters that the text messages illustrated the hostility in their relationship which provided Carr with a potential motive. We agree. "Hostility is a paradigmatic motive for committing a crime." *Hicks v. State*, 690 N.E.2d 215, 222 (Ind. 1997)*; see Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (finding "[n]umerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime."), *trans. denied*; *see Elliott v. State,* 630 N.E.2d 202, 204 (Ind. 1994) (finding prior threats of violence to ex-wife and victim admissible to show the relationship between the parties and defendant's motive, plan, and absence of mistake); *Price v. State,* 619 N.E.2d 582, 584 (Ind. 1993) (finding prior bad acts against the victim are admissible "to

show the relationship between the parties and appellant's motive[.]"), *reh'g denied*. And evidence of motive is always relevant in proving a crime. *Cadiz v. State*, 683 N.E.2d 597, 599 (Ind. Ct. App. 1997).

[24] The October 2022 text messages demonstrated the tumultuous relationship between Carr and Smith. Carr argues that the text messages merely show "one event [that] happened two months before [Smith]'s murder." *Appellant's Br.* at 18. But the text messages showed a relationship peppered with conflicts and threats throughout. They called each other names, Carr told Smith she meant "nothing to [him]," Smith accused Carr of threatening her and breaking her door, and Carr accused Smith of cheating on him. Thus, these text messages were relevant in demonstrating the relationship between Carr and Smith and Carr's motive in murdering Smith.

## B. Texts Were Not Unfairly Prejudicial

[25] Although the evidence was relevant to show motive under the first prong of the 404(b) test, "it may still be inadmissible under the second prong of the 404(b) test if its probative value is substantially outweighed by the danger of unfair prejudice." *Hicks*, 690 N.E.2d at 223. For example, evidence can be more prejudicial than probative if it is remote in time or there is other ample evidence of hostility upon which the State can rely. *See id.* Carr argues that even if this evidence is admissible under a 404(b) exception, it is still inadmissible for being unfairly prejudicial. Trial courts have great discretion in weighing probative

value against the danger of unfair prejudice, and we review that determination for abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021).

[26]     All relevant evidence is inherently prejudicial in a criminal prosecution. *Id.* at 1194. Thus, our inquiry comes down to a "balance of probative value against the likely unfair prejudicial impact the evidence may have on the jury." *Richmond v. State*, 685 N.E.2d 54, 55-56 (Ind. 1997). Here, the trial court was required to consider whether the text messages containing evidence of his prior acts of violence toward Smith, though relevant to show motive, were unduly prejudicial. "[A]t some point testimony about every incident of violence between the two becomes more prejudicial than probative." *Hicks*, 690 N.E.2d at 223. In *Hicks*, our Supreme Court found the trial court did not abuse its discretion by admitting evidence of two domestic violence incidents between the parties, one occurring one year before the murder and one occurring approximately six months before the murder, even though the State also introduced the defendant's own statements that he had a "violent relationship" with the victim. *Id.* Here, the text messages between Smith and Carr showed their history of hostility and violence only two months before the murder. Frances's testimony at trial and Carr's own statements to police established Smith and Carr had a rocky relationship. Still, the text messages conveying Carr's direct threats to Smith, as well as his previous act of kicking in Smith's door, were relevant to show Carr's potential motive for murdering

Smith.  We conclude these texts had substantial probative value that outweighed the danger of unfair prejudice.

### 3. Sufficiency of the Evidence

[27]  Sufficiency of the evidence claims warrant a deferential standard of review in which we "neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury." *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024).  A conviction is supported by sufficient evidence if there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  *Id.*  In conducting this review, we consider only the evidence that supports the jury's determination, not evidence that might undermine it.  *Id.*  We affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.  It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence.  The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

[28]  To convict Carr of murder, the State was required to establish beyond a reasonable doubt that Carr "knowingly or intentionally kill[ed]" Smith.  Ind. Code § 35-42-1-1(1).  Carr argues that his presence at the crime scene alone is not enough to support a conviction--especially since the murder weapon was

not recovered, no physical evidence linked him to the murder, and his statements to others that he was going to jail for a long time were not explicit confessions to a crime. *See Appellant's Br.* at 20. But we do not look at each of these factors in isolation, rather we view each in relation to all of the evidence the jury received. A conviction for murder may be sustained on circumstantial evidence alone. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). While no murder weapon was found, a murder weapon is not required to prove the offense of murder. *McCurdy v. State*, 324 N.E.2d 489, 493 (Ind. 1975). Further, while we agree that mere presence at the crime scene is not enough to support a murder conviction, "presence at the scene in connection with other circumstances tending to show participation may be sufficient to sustain a conviction." *Pratt v. State*, 744 N.E.2d 434, 436 (Ind. 2001). Numerous other circumstances showed Carr's participation. Carr left Smith's house on the night of December 2nd after an argument in which he called Smith profane names and told her that he "[had] a gun and drugs on [him]." *Tr. Vol. 4* at 24. Carr then went to the Home Plate Pub with a handgun and later left that bar with his handgun. In the early morning hours of December 3rd, Keaton drove Carr to Smith's house where phone records placed him from approximately 4:46 until 7:19 a.m. Carr answered Smith's phone and refused to put her on the phone when asked. Around the time Carr was at Smith's house, a loud noise awoke Smith's neighbor who then heard "two more shots that sounded like gunshots." *Id.* at 125. Carr returned to the Home Plate Pub and told Anderson he "did something bad and he might be going to jail for a while." *Id.* at 181. While any

one of these facts in isolation may not be enough to convict Carr of murdering Smith, cumulatively they paint a different picture. The weight of this evidence was properly left to the jury, and we conclude that a reasonable jury could find Carr guilty of murder.

## Conclusion

[29] We find that the trial court did not err in admitting into evidence the detective's testimony that Carr was the only suspect and the text messages relating to a recent unrelated altercation between Smith and Carr. Further, there is adequate evidence that Carr murdered Smith. Accordingly, we affirm Carr's conviction for murder.

[30] Affirmed.

May, J., and Tavitas, J., concur.

ATTORNEY FOR APPELLANT

R. Brian Woodward
Office of the Lake County Public Defender—Appellate Division
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Catherine Elizabeth Brizzi
Deputy Attorney General
Indianapolis, Indiana